In re the Marriage of Edward J. FASTNER, Petitioner, Appellant,

v.

Patricia A. FASTNER, Respondent.

No. C2–88–132.

Court of Appeals of Minnesota.

July 26, 1988.

Lawrence D. Olson, Roseville, for petitioner, appellant.

Allen H. Aaron, Phillips, Gross & Aaron, P.A., Minneapolis, for respondent.

Heard, considered, and decided by WOZNIAK, C.J., and CRIPPEN and SHORT, JJ.

## OPINION

WOZNIAK, Chief Judge.

Edward and Patricia Fastner both appeal their dissolution decree. Edward disputes the trial court's valuation and distribution of assets, maintenance award, and its refusal to recognize a claimed nonmarital interest in the parties' homestead. Patricia appeals the trial court's failure to order Edward to include her as a named beneficiary under Edward's life insurance policy during the period of spousal maintenance. This appeal follows the trial court's denial of cross motions for amended findings of fact, conclusions of law, or a new trial. We affirm in part, reverse in part, and remand for further consideration by the trial court.

## FACTS

At the time of the dissolution, Edward Fastner was 58 and Patricia Fastner was 54. They had been married since 1955. The parties have three adult children. The youngest (age 22) is in college and continues to reside with Patricia in the parties' homestead.

The parties separated in November 1982. This dissolution action was commenced in September 1984. A temporary order pertaining to maintenance, occupancy of the homestead, and other matters was entered in November 1984.

A trial was held in October 1987. Numerous issues were contested. The testimony at trial and the trial court's findings of fact related to the following broad areas: the parties' health, work history and income, living expenses, assets, and need for maintenance.

*Parties' Health*

Both parties have significant health problems. The trial court found that Edward suffered from probable multiple sclerosis [MS], but that he presently was able to work on a full-time basis and provide for his own needs. He limps and drags a foot as a result of the MS. He can no longer

run or carry heavy objects. He claimed concentration and memory problems which have led to a decline in his job performance; the medical documentation indicates this is a result of stress related to concerns over job performance and the pending divorce. He testified that his job performance has suffered as a result of the decrease in mobility he has suffered as a result of MS.

The medical documentation also discusses the future impact of MS on Edward's health. The doctors are unanimous in their assessment that the disease is progressive, although the progression of his disease is not that usually seen in MS patients (instead of periods of attack followed by remission, he has experienced a steady downward decline in muscle control). His doctor's June 1987 assessment of Edward's work and life expectancy indicates:

> It is my opinion that [Edward's MS] is going to interfere with his continuing to work and will do this in the very near future. * * * I, however, would be concerned that this is going to be a cause for a medical retirement in the near future.
>
> * * * * * *
>
> It is fair to say that patients with multiple sclerosis have a shortened life expectancy and that this shortened life expectancy sometimes is substantial.
>
> I have some fears that his life expectancy may be shortened and the possibility that this shortening may be substantial would have to be thoroughly entertained.

A March 1986 report from the Mayo Clinic equivocates in its assessment of the potential impact of MS on Edward's life:

> As far as his neurologic diagnosis, I think he likely has multiple sclerosis of late onset. * * * Hopefully, this too will stabilize or if it progresses, will do so in a slow fashion, enabling Mr. Fastner to compensate for his disability.

*Patricia's Health*

The trial court enumerated the various health problems with which Patricia is afflicted. Her left kidney has been removed. She has had a tumor removed from her stomach; this condition may be precancerous. She has been diagnosed as suffering from optic neuritis, and is legally blind in the left eye. She also may develop problems in her right eye. She is under continuing medical care, and makes frequent trips to Mayo Pain Clinic where she receives injections for the pain she experiences as a result of the neuritis.

The trial court concluded that Patricia's medical problems made it extremely difficult for her to work consistently on a full-time basis, although she has been able to work nearly full-time for the past three years.

*Work History and Income*

Edward has been employed at 3M for 21 years. Most of his career has been spent as a machine designer, the job he currently holds. His current income is $2,430 per month gross, with a net income of $1,635.

Patricia worked outside the home for a brief period following the parties' marriage in 1955. She again began working outside the home, as a part-time caterer, in the early 1970's. She began working full-time as a caterer in 1979 or 1980. She quit this job two years later, and did not reenter the job market on a significant basis until 1984, when she began working at her present job as assistant manager of a catering department. Her current income is $1,766 per month gross, with a net income of $1,295.[1]

*Reasonable Living Expenses*

The trial court found that Edward's current reasonable monthly living expenses are $1,719, and Patricia's are $1,996.

*Assets*

a. Pension Plan

The pension supervisor in charge of administering 3M pension plans testified re-

---

1. On appeal, Edward contends that Patricia's income is understated. As he did not address this issue to the trial court in his motion for amended findings of fact, we decline to address it. *See Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986) (failure to address issue in

post-trial motion precludes appellate review). Similarly, we will not address Edward's contentions regarding Patricia's living expenses, or Patricia's complaint regarding a trial court finding on Edward's income.

garding the value of Edward's pension plan. She indicated that Edward could retire at the time of trial under an early retirement plan and begin receiving pension benefits (including an additional incentive provided by 3M) immediately.[2] The present value of the plan, if Edward were to take early retirement, would be (on the dates indicated):

| Date | Monthly benefit | Present value |
|------|----------------|---------------|
| Nov. 82 (parties separate) | Not eligible for early retirement. | |
| Sept. 84 (dissolution filed) | $226 | $27,314 |
| Oct. 87 (date of trial) | $374 | $42,778 |

The pension expert also testified regarding the value of the pension if Edward were to retire at age 65 (thereby foregoing the monetary incentive for early retirement):

| Date | Monthly Benefit | Present Value |
|------|----------------|---------------|
| Nov. 82 | $270 | $ 9,636 |
| Sept. 84 | $348 | $14,503 |
| Oct. 87 | $437 | $23,765 |

The trial court valued the pension at $42,778, a figure which assumes a normal life expectancy for Edward and also *assumes that he will retire immediately* (and collect $374 per month). At trial, Edward testified that he had no intention of retiring at this time, and that he intended to work as long as he was physically able.

### b. Homestead

The parties stipulated that the homestead had a value of $65,000. Edward testified that he originally purchased the homestead in his own name with nonmarital assets of $1,340. The original purchase price was $13,900. The trial court denied Edward's nonmarital claim because it was not raised prior to trial.

### c. 3M Stock

The marital estate included 271 shares of 3M stock accumulated through Edward's employment. This included 225 shares accumulated as part of an employee stock option plan and 46 shares in a company savings plan.[3]

The trial court valued the stock as of the date of the trial (at slightly under $83 per share, near the stock's five-year high), for a total value of $22,486. After trial, but before final arguments of the parties, the stock market took its October 1987 plunge. At the time the trial court's findings of fact were issued, the stock was worth only $54 a share, for a total value of $14,634.

### d. Miscellaneous Assets

Edward also received the interest in another company savings plan, valued at $3,087, which will be available and taxable upon retirement or termination of employment.

Patricia received life insurance with a cash value of $1,352 and an amount receivable (from a nephew) of $1,500.

### e. Debt

The trial court made the following finding of fact regarding the parties' joint debt:

17. That at the time of the Temporary Order in this matter, the parties had joint unsecured debts of $11,344.63. The Petitioner has made all payments against

---

**2.** The additional incentive for early retirement increases the payments (*and thus the value*) of the pension; if an employee does not retire early, the employee would never receive the retirement incentive.

**3.** Of the 225 shares in the stock option plan, 155 were received as a stock dividend and have no tax basis. Edward therefore would be liable for capital gains taxes on the entire amount eventually received from the sale of the stock. The 46 shares in the savings account are not available to Edward until he retires or terminates his employment. The value of the stock will be taxable on receipt. It is unclear whether the trial court took these tax consequences into consideration when it made its property division; we note that under certain circumstances, the court must consider the tax effect of the property distribution. *See Salstrom v. Salstrom,* 404 N.W.2d 848, 853 (Minn.Ct.App.1987) (citing *Aaron v. Aaron,* 281 N.W.2d 150, 153 (Minn.1979)). On remand, the trial court may need to take these tax consequences into consideration when making the property distribution; this will depend on an application of the principles outlined in *Salstrom* and *Aaron.*

those debts during the time the parties have been separated. *The joint debts of the parties at the time of the separation were joint debts and were a marital obligation which should be satisfied out of the assets of the parties.* (Emphasis added.) The trial court, however, in its conclusions of law, assigned the debt to Edward:

> That [Edward] is ordered to assume and continue to pay those marital debts assumed by him as of the date of the Temporary Order in this matter, which debts amount to $11,344.63. The petitioner is given adequate consideration for the assumption of these debts in the balance of the property distribution.

### Overall distribution of assets

Using the valuations given the property *by the court,* the net result of the property distribution is as follows:

| ASSET | AWARDED PATRICIA | AWARDED EDWARD |
|---|---|---|
| House | $65,000 | |
| Household Goods | 4,000 | $ 370 |
| Stock (225 shares) | | 18,646 |
| PAYSOP (46 shares) | | 3,840 |
| VIP | | 3,087 |
| Pension | | 42,778 |
| Life Insurance | 1,352 | |
| Acct. Receivable | 1,500 | |
| Debt | — | (11,344) |
| TOTAL AWARD | $71,852 | $57,377 |

### Maintenance

The trial court ordered Edward to pay Patricia $175 per month in permanent maintenance. The court denied Edward's request to reserve the question of whether he should be awarded maintenance. The trial court also ordered Edward to maintain his group health insurance coverage on Patricia, but ordered Patricia to pay any extra costs of that coverage.

Both parties moved for amended findings of fact and conclusions of law. The trial court denied these motions. The court did not issue a memorandum explaining its decision.

### ISSUES

1. Did the trial court abuse its discretion in its valuation of Edward's pension plan?

2. Did the trial court abuse its discretion in its valuation of the parties' stock?

3. Did the trial court abuse its discretion in awarding Patricia spousal maintenance and denying Edward's request to reserve the question of maintenance for both parties?

4. Did the trial court abuse its discretion in denying Edward's claim of a nonmarital interest in the parties' homestead?

5. Did the trial court abuse its discretion in refusing to order Edward to name Patricia as a beneficiary under his life insurance?

6. Did the trial court err in its division of the marital debt?

### ANALYSIS

■■■ The trial court is to make a "just and equitable" division of the marital property of the parties. Minn.Stat. § 518.58, subd. 1 (1986). The court need not, however, make an equal division of the property acquired during the marriage. *See Ruzic v. Ruzic,* 281 N.W.2d 502, 505 (Minn. 1979). The court has broad discretion in the division of property, *Bollenbach v. Bollenbach,* 285 Minn. 418, 426, 175 N.W.2d 148, 154 (1970), and will be overturned only upon an abuse of that discretion. *Bogen v. Bogen,* 261 N.W.2d 606, 609 (Minn.1977).

■■ 1. The valuation and division of pension rights generally is a matter for the trial court's discretion. *Taylor v. Taylor,* 329 N.W.2d 795, 798 (Minn.1983). This court will not reverse unless the trial court has abused that discretion. *See Ronnkvist v. Ronnkvist,* 331 N.W.2d 764, 766 (Minn. 1983). However, exercise of the trial court's discretion "is not unlimited and should be supported by either clear documentary or testimonial evidence or by comprehensive findings issued by the court." *Id.*

The *Taylor* court noted that there were two ways to divide a pension, either the present value method or the fixed percentage method:

> In deciding whether retirement benefits should be divided at the time of dissolu-

tion or upon future receipt by the employee spouse, the trial court should consider the advantages and disadvantages of each method in light of the facts of the particular case before it.

*Id.* at 798.

The court then discussed the present value method and the circumstances under which it should be used:

Division of retirement benefits at the time of divorce has the obvious advantage of avoiding the continuing jurisdiction of the court in order to insure that the appropriate payments are made to the non-employee spouse upon receipt of pension benefits by the employee spouse. *This method is preferred where there are sufficient assets available at the time of the divorce to divide the present value of the retirement benefits without causing an undue hardship to either spouse and where testimony on valuation is not unduly speculative.*

*Id.* at 798–99 (emphasis added).

The court also discussed the fixed percentage method:

A second method [of valuation and division of the pension] requires the determination of a fixed percentage for the non-employee spouse of any future payments the employee receives under the plan, payable when paid to the employee. This method, chosen by the trial judge in the instant case, has the advantage of making it unnecessary to determine the present value of the pension fund. *The fixed percentage method should be used where present value determinations are unacceptably speculative or there are not enough assets to equitably require that benefits due in the future be split presently.*

*Id.* (emphasis added).

Edward makes several claims regarding the valuation of the pension—that any valuation of the pension was speculative given Edward's unclear life expectancy, that the court erred in assuming early retirement, that the court abused its discretion by failing to enter a qualified domestic relations order, and that the court should not have valued the pension as of the date of the trial.

a. Speculative Valuation

■ The trial court may not speculate with respect to valuations. *Taylor,* 329 N.W.2d at 798–99. In Edward's post-trial motion, he asserted the valuation was speculative because he had shown he did not have a normal life expectancy. The trial court's valuation of the pension necessarily implies a finding that Edward has not shown his life expectancy shortened by his muscular condition. Edward's doctor, however, was unable to state that Edward's life expectancy was shortened as a result of MS; he merely states he is concerned with such a possibility:

I have some fears that his life expectancy may be shortened and the possibility that this shortening may be substantial would have to be thoroughly entertained.

A statement about mere possibilities does not compel the trial court to find that Edward's life expectancy has been shortened.

b. Early Retirement

■ In valuing a pension, the trial court's determination of a retirement date (for purposes of determining the present value of the pension) must be supported by the record or by specific findings of the trial court. *Nash v. Nash,* 388 N.W.2d 777, 780 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Aug. 20, 1986) (citing *Ronnkvist,* 331 N.W.2d at 766); *Hein v. Hein,* 366 N.W.2d 646, 650 (Minn.Ct.App. 1985).

In *Hein,* this court reversed a trial court pension valuation. The trial court heard varying estimates of the value of the pension based on a number of different retirement ages. The trial court chose a retirement age in between the ages proposed by the parties, and valued the pension on that basis. This court reversed, directing the trial court to provide an explanation of the reason it chose the particular retirement date for valuation of the pension. *Id.* at 650.

In *Nash,* this court addressed a similar valuation by the trial court and again re-

versed. The only testimony regarding present value of the pension assumed either retirement at age 57 or age 65. The trial court valued the pension as if the proposed retiree were going to retire at age 65. This court reversed, holding that the trial court erred in assuming retirement at age 65; nothing in the record disclosed an incentive for the proposed retiree to work to that age. *Nash*, 388 N.W.2d at 781.

This court has concluded that requiring the trial court to state a rationale for its choice of a retirement date is for the benefit of both parties:

> Risks to both parties accompany present valuation of a pension because the value is dependent on the age at which the employee retires, a fact not known when the value is assessed.

*Larson v. Larson*, 412 N.W.2d 773, 776 (Minn.Ct.App.1987). *See also Kottke v. Kottke*, 353 N.W.2d 633, 637 (Minn.Ct.App. 1984) *pet. for rev. denied* (Minn. Dec. 20, 1984) (affirming trial court's use of fixed percentage method where a spouse's retirement benefits would vary depending on choice of retirement date, the evidence did not reasonably support a correct calculation of the present value of those benefits); *Mikoda v. Mikoda*, 413 N.W.2d 238, 243 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Dec. 22, 1987).

In the case before this court, the trial court assumed an early retirement. The trial court made no finding regarding why it chose this date of retirement for valuation of the pension, even in the face of Edward's positive testimony that he had no plans to retire early. Based on *Nash* and *Hein*, we reverse the trial court's valuation of the pension and remand for considera-

tion of whether the pension is capable of valuation at the present time because of uncertainty about Edward's retirement date. If the pension is not capable of valuation at the present time, the trial court should consider division of the asset under the possibilities outlined in *Taylor* and *Larson*, or through entry of a qualified domestic relations order.

#### c. Qualified Domestic Relations Order (QDRO)

Edward suggested to the trial court that a QDRO [4] would be a suitable solution to the problems posed by the valuation of Edward's pension asset. There is no case law in Minnesota regarding the circumstances under which a trial court must use such an order. Such an order, however, is merely a refined version of the "fixed percentage" method of dividing a pension. The obvious advantage of a QDRO (over, for example, an award of 50% of the future benefits actually received) is that the nonpensioned spouse has the option to receive payment during his or her own lifetime (see footnote 4). Thus, the benefit would not fail in the event of the death of the pensioned spouse.

■ We conclude that a QDRO is one of the solutions to be used, in the discretion of the trial court, when fashioning the equitable division of a pension right. It is our impression from the record that such an order may be the best solution to the problems posed by the valuation of the pension in this case. This may necessitate some other disposition of the parties' homestead; the trial court may need to consider a sale of the home, or a lien in favor of the party not in possession of the homestead. As in *Taylor*, a sale of the house would

---

4. Under 29 U.S.C.A. § 1056(d)(1) (West Supp. 1987), "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." There is an exception to this rule. Section 1056(d)(1) does not apply to a domestic relations order if the order is determined to be a "qualified domestic relations order." 29 U.S.C.A. § 1056(d)(3)(A). Each pension plan must provide for the payment of benefits in accordance with any such order. *Id.* There are several statutory requirements to a QDRO, *see* 29 U.S.C.A. § 1056(d)(3)(A)–(D), but

the 3M pension expert indicated the 3M plan would certainly abide by any such order. According to 3M's pension expert, the recipient (in this case, Patricia) would have to decide whether to take benefits *immediately*, and whether to measure the benefits in terms of *her life or Edward's life*. The amount of value attributed to the pension would be the vested present value; it could not include any subsidized retirement benefit unless Edward actually did retire early. *See* 29 U.S.C.A. § 1056(d)(3)(E)(i)(II).

"provide each of the parties with approximately $30,000 with which to start a new life." *Taylor*, 329 N.W.2d at 799.

### d. Date On Which To Value Pension

██ Property acquired by the parties after commencing the dissolution, but prior to the final decree, is marital property. Minn.Stat. § 518.54, subd. 5 (1984); *Ronnkvist*, 331 N.W.2d at 766. The trial court valued the pension as of the date of the hearing; Edward contends it should have been valued either as of the date of the parties' separation (1982) or as of the date of the temporary order (1984).

Edward argues that *Gummow v. Gummow*, 375 N.W.2d 30 (Minn.Ct.App.1985), requires the trial court to value the pension at some date other than the date of the final decree. In *Gummow*, however, this court specifically ruled that the trial court's valuation of a pension as of the date of the parties' separation (rather than as of the date of the dissolution) was error. *Id.* at 35–36.

██ The trial court's inclusion of the increased value of the pension in its valuation of the marital property was correct. Minn.Stat. § 518.54, subd. 5 (1984); *Ronnkvist*, 331 N.W.2d at 766. In the absence of extraordinary circumstances, marital property includes property acquired by the parties between their separation and final decree.[5]

██ 2. The specific issue of a decline in a stock's value after trial, but before findings of fact have been issued, has not been addressed in Minnesota. Minnesota appellate courts have, however, considered a decline in value between trial and *appeal*, and indicated the change in value occurring during that period should be taken into consideration when dividing marital assets.

In *Bollenbach*, the supreme court took judicial notice of the fact that stock awarded one party had decreased from about $85 to $54 dollars per share during the pendency of the appeal. *Id.* 285 Minn. at 429, 175 N.W.2d at 156 n. 5. The court ruled:

Where property, such as common stock, having a value which may fluctuate from day to day is involved, and where the market value of such property is readily ascertainable, * * * and where the decree of the district court authorizes or directs payment of a given percentage of the value of such property to the wife in cash, the decree should be so phrased as to permit such modification as might be required to prevent the inequities resulting from marked changes in market value of the property between the date of the decree and a timely execution of the plan of distribution * * *.

*Id.* at 436, 175 N.W.2d at 159. *Bollenbach* differs from the case before this court in that Edward was not required to make any payment out of stock which must be liquidated. This difference, however, does not undermine the thrust of *Bollenbach*, which is that the value assigned the stock has become inequitable in the context of the decree because of the "marked change" in the value of the stock. *See also Salstrom v. Salstrom*, 404 N.W.2d 848, 852 (Minn.Ct. App.1987) (remanded to consider effect of stock's plummeting values on the division of property); *Otte v. Otte*, 368 N.W.2d 293, 299 n. 1 (Minn.Ct.App.1985) ("Where the value of an asset has changed substantially between the time of trial and appeal, * * * a court should consider the effect of that change on the fairness of the property division").

In the case before us, the stock underwent a drastic change in value shortly after trial. The rationale for taking notice of the decline applies with more force to a trial court contemplating a motion for amended findings of fact; the finding has become inequitable at an earlier time than the court recognized in *Bollenbach*. We reverse the trial court's valuation of the stock and re-

---

5. Under a recent amendment to Minn.Stat. § 518.54, subd. 5 and Minn.Stat. § 518.58, subd. 1, the date for valuation of marital assets will change. *See* 1988 Minn.Laws ch. 590, §§ 1 and 2. The amendment requires the trial court to value marital assets as of the date the dissolu-

tion is commenced. *Id.* This amendment, however, does not apply to the case before us; the amendment applies only to cases commenced on or after August 1, 1988. *See* 1988 Minn. Laws ch. 590, § 3.

mand for the trial court to take the decrease in value into consideration when making the property division. The court may do this through a division of the asset itself, thereby negating the need for a valuation. If the court chooses to value the stock, we hold that, under the unusual circumstances of this case, it should be valued at the time of remand.

3. The trial court is accorded broad discretion with respect to spousal maintenance and there must be "a clearly erroneous conclusion that is against logic and the facts on record before this court will find that the trial court abused its discretion." *Wiltsey v. Wiltsey*, 357 N.W.2d 400, 402 (Minn.Ct.App.1984) (citing *Rutten v. Rutten*, 347 N.W.2d 47, 50 (Minn.1984)). Minn. Stat. § 518.552, subd. 1 (1986) allows an award of maintenance if the court finds the spouse seeking maintenance:

(a) lacks sufficient property, including marital property apportioned [the party], to provide for [the party's reasonable needs] considering the standard of living established during the marriage, especially, but not limited to, a period of training or education, or

(b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment * * *.

In this case, the trial court specifically found that Patricia would be unable to meet her needs based on the amount of marital property she received, her reasonable needs, the standard of living during the marriage, the parties' financial resources, the duration of the marriage, and Patricia's poor physical health. As the basis for the trial court's maintenance award was, in part, its erroneous valuation and award of marital property, the maintenance award also is reversed. The trial court should reconsider the issue of maintenance on remand.

■ We also agree with Edward that the trial court failed to recognize the potential impact of his physical disability on his possible future need for maintenance. On remand, the trial court should consider the need for maintenance for both parties; while it need not make a maintenance award, the health problems of both parties compel at least the reservation of maintenance for both parties. By reserving the issue of maintenance, the trial court will be in a better position to later assess and address the impact of future changes in the parties' health which affect their ability to support themselves.

■ 4. The trial court specifically found that the marital debt should be paid out of the assets of the parties. The court then apportioned the entire debt to Edward. We agree that the debt should be paid out of the marital estate; however, the debt should be apportioned between the parties. Saddling Edward with the entire marital debt, which was to be satisfied out of assets which were overvalued, was an abuse of the trial court's discretion. We reverse that conclusion, and remand for the trial court to, in its discretion, choose one of the three options available to it: provide for payment of the debt out of marital assets, order an equal division of the debt between the parties, or, if the court assigns the debt to Edward, provide an offsetting award of other marital property to him.

■ 5. Where a party provided notice of a nonmarital claim prior to trial, it is an abuse of discretion for the trial court to exclude evidence of the claim. *Ervin v. Ervin*, 404 N.W.2d 892, 894 (Minn.Ct.App. 1987), *pet. for rev. denied* (Minn. June 26, 1987). Edward claims Patricia was put on notice of his nonmarital claim as a result of the following colloquy, which occurred at Patricia's deposition:

Q. When did you buy that home?

A. Before we were married.

\* \* \* \* \* \*

Q. Did [the contractor build the house] under contract with you or with Ed or with both of you?

A. It was with Ed to begin with and after we were married it was changed to both of our names. The house wasn't ready until a month after we were married.

Q. Do you remember how much you paid for the house?

A. [$13,500].

Q. Do you remember how much you put down on the house when you bought it?

A. No. I'm sure there are records of it. Ed would have those.

Q. Do you know where the downpayment came from?

A. Can't remember at the time.

Q. Obviously you had to give the contractor some money before you got married?

A. I can't remember but I'd probably say a thousand but I'm not sure what it was. There's a record of it and Ed should have a record of that.

Q. Was that Ed's money?

A. I couldn't tell you. I can't remember. I can't remember that.

Q. You don't know if Ed put that money down or if you put the money down?

A. I can't remember what we did.

The trial court found that this excerpt did not provide notice of the nonmarital claim. While reasonable minds could differ on this question, we cannot say the trial court was incorrect in coming to this conclusion.

 6. Patricia relies on *Arundel v. Arundel,* 281 N.W.2d 663 (Minn.1979), for her claim that the trial court abused its discretion in its failure to order her as a named beneficiary under Edward's insurance policy to secure payment of maintenance in the event of Edward's death. In *Arundel,* the trial court ordered the husband to purchase life insurance as security for the wife's permanent award of alimony, but allowed this requirement to lapse when the wife reached age forty. The supreme court held that it was an abuse of discretion for the trial court to allow the insurance requirement to lapse, noting that:

The apparent purpose of this particular life insurance award was to provide alimony in the event that [the husband] should predecease [the wife]. With such a purpose, it does not make sense to remove the insurance protection at a fixed date, other than at the death or remarriage of [the wife].

*Id.* at 667. It is the "exceptional" case, however, where the trial court must order security for future support payments. *O'Brien v. O'Brien,* 343 N.W.2d 850, 853 (Minn.1984) (finding exceptional circumstances; wife with poor employment prospects which were unlikely to improve, and who was to care for daughter who had cerebral palsy); *Riley v. Riley,* 369 N.W.2d 40, 44 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Aug. 29, 1985) (no abuse of discretion in refusal to order party to obtain life insurance to secure child support obligation); *Fredericksen v. Fredericksen,* 368 N.W.2d 769, 777 (Minn.Ct.App.1985) (trial court abused discretion in refusing to order security under "exceptional" circumstances of case: maintenance recipient had severe emotional and physical problems, including narcolepsy, chemical dependency, obesity, and depression).

While the issue is close, the circumstances of this case are not as "exceptional" as those present in *O'Brien* and *Fredericksen.* Patricia does have job skills, and is employed. The trial court did not abuse its discretion in its denial of Patricia's request for insurance on Edward's maintenance obligation.

 Patricia also requests an award of attorney fees on appeal. She gives no specific reason for this request, and cites no authority for the request. We decline to award fees. Her attorney has requested such fees on five separate occasions during the course of this case, and has never cited any authority which would support such an award. Such repeated requests are unreasonable, particularly where a party has not attempted to provide the court with any rationale for such an award. From the record and from counsel's statement at oral argument, it is apparent that the Fastners' modest marital estate will be subjected to attorney fees approaching $30,000; we see no reason to shift an additional portion of this burden onto Edward.

In viewing the entire file in this case, it appears that some of the motion practice in this case could have been avoided. *See L.K. v. Gregg,* 425 N.W.2d 813, 821–22 (Minn.1988) (expressing disapproval of unnecessary litigation, admonishing party for failure to seek negotiated settlement). The parties stipulated to the 1984 temporary order and to the value of their largest asset, their homestead. Nevertheless, the parties have made eight different pre- and post-trial motions, some covering several issues. It is difficult to imagine that much of this legal maneuvering could not have been avoided; application of a simple cost-benefit analysis to this protracted animosity makes the enormous fees appear somewhat irrational. The parties to any litigation should be fully informed regarding the limited benefit of litigating every single dispute; in dissolution cases, the litigation of every issue as it arises (including, in this case, two motions to compel discovery of clearly discoverable materials) strikes this court as counterproductive, where the eventual goal is to provide each of the parties with an equitable portion of their marital estate.

## DECISION

The trial court's valuation of Edward's pension and the 3M stock is reversed and remanded to the trial court with directions to reconsider the valuation and overall distribution of the parties' assets consistent with this opinion. As these decisions have an impact on the disposition of the homestead and the award of maintenance, those portions of the trial court's award are also reversed, to be considered by the trial court when it fashions a more equitable distribution of the parties' marital assets.

The trial court acted within its discretion in denying Patricia's request for security on her maintenance award. The request for attorney fees is denied.

Affirmed in part, reversed in part, and remanded.