744 N.W.2d 444 (2008)
275 Neb. 87
Stephanie BLAINE, appellant,
v.
Dennis BLAINE, appellee.
No. S-06-927.
Supreme Court of Nebraska.
February 15, 2008.
*445 Charles M. Bressman, Jr., of Anderson & Bressman Law Firm, P.C., for appellant.
Donald A. Roberts, of Lustgarten & Roberts, P.C., L.L.O., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
Stephanie Blaine and Dennis Blaine were divorced in 1998, and a consent decree divided the marital estate. Dennis was responsible for preparing qualified domestic *446 relations orders to divide certain investments that Dennis held. Dennis failed to do so for several years, and some of the investments depreciated. The question presented in this appeal is whether, when the investments were finally divided in 2006, Stephanie should have been awarded her share based on the existing value of the investments or the value of the investments on the date specified in the decree.

BACKGROUND
The parties were divorced by a consent decree entered in the district court on October 5, 1998. The decree divided a substantial marital estate and included, as relevant, the following three provisions:
US Software Profit Sharing 401K PlanThis Plan will be divided pursuant to a Qualified Domestic Relations Order, equally between the parties as of February 3, 1998.
Sitel Corporation 401K PlanThis account shall be divided pursuant to a Qualified Domestic Relations Order equally between the parties as of February 3, 1998.
. . . .
Intrust IRA Account . . .  This account shall be divided pursuant to a Qualified Domestic Relations order equally between the parties as of February 3, 1998.
Other asset divisions, not at issue in this case, more specifically stated that accounts were to be divided "based upon [their] value as of February 3, 1998." The decree further ordered the parties to "execute any and all documents necessary or proper to fulfill the terms and/or requirements of their Property Settlement Agreement as hereinabove set forth."
On December 15, 1998, Stephanie moved for an order requiring Dennis to, among other things, complete a qualified domestic relations order (hereinafter QDRO) with respect to each of the following accounts: US Software, Inc.; Sitel Corporation (Sitel); and Intrust Independent Trust Corporation (Intrust). A hearing was held the next day, at which Dennis' attorney explained that with respect to the QDRO's, he was "preparing those for division of those assets." The court noted on the record that Dennis' attorney "has agreed that he will now prepare the qualified domestic relations orders." Stephanie's ' counsel clarified that she wanted "to make sure that all documents reflect that February 3rd, 1998 date." She requested that "all of those documents reflect that date specifically for division of those assets pursuant to the decree." Dennis' counsel replied, "We have no problem with that." The court explained that
there isn't going to be any more fooling around with this case. We are getting it over with. After today the only thing I expect to see are those qualified domestic relations orders which I will have to sign. Other than that, I do not expect to see the parties down here going over things that they have already been ordered to do.
But it was not until February 27, 2001, that a QDRO was filed in the court with respect to the U.S. Software account, awarding "50% of the Plan as of February 3, 1998." However, U.S. Software's corporate successor informed Dennis' counsel in a letter dated March 12, 2001, that it could not honor the QDRO because Dennis had moved the account to Piper Jaffray in September 2000. We note at this point that all of the accounts either moved or changed names at various times between the entry of the original decree and the contempt proceeding that is the subject of this appeal. While the relevant transfers are discussed below in more detail, for *447 clarity's sake, each account is generally referred to by its original designation.
On July 2, 2004, Stephanie filed an application to show cause, asking the court to order Dennis to show cause why he should not be held in contempt of court for preparing only one of the three QDRO's necessary to transfer Stephanie's share of the investments at issue. The court issued such an order. A hearing was eventually held on June 28, 2006, The issue at the hearing was not whether the QDRO's should finally be entered, but the value of the assets to be transferred. Stephanie sought 50 percent of the value of the accounts as of February 3, 1998, while Dennis argued that the accounts should be divided at their existing value.
Stephanie testified that at the time of the hearing, she had not been presented with any QDRO's for any of the three accounts. She explained that the QDRO filed in 2001 had never been provided to her. Stephanie said she had, over, the years, made several efforts to try to get her share of the accounts transferred to her. She testified that in 1999, she had called U.S. Software, and that in 2000, she had written a letter, enclosing a copy of the divorce decree, but had not received a reply. Stephanie had also called Sitel in 1999 and written a letter in 2000. In response, Sitel had sent a letter to Dennis, copied to Stephanie, instructing him how to divide the account. Stephanie said she wrote Dennis in 2000, asking him to help her transfer the accounts, but Dennis did not respond.
In 2000, Dennis attempted to transfer the Intrust account to Piper Jaffray. Intrust refused, informing Dennis that one of the reasons for the refusal was that Stephanie had sent Intrust a copy of the decree of dissolution. Dennis moved the Sitel account to Piper Jaffray in 2000, and then to Robert W. Baird & Co. Inc. The U.S. Software account was also moved from U.S. Software's corporate successor to Piper Jaffray and then to Robert W. Baird & Co. Dennis testified that he "assume[d]" that someone had prepared the QDRO's on his behalf and did not recall receiving a call or written communication suggesting that the U.S. Software account could not be transferred. Nor did he recall receiving a letter from Stephanie asking him to help her transfer the accounts. Dennis explained that when he moved the accounts, he believed that Stephanie had already received her half. Dennis testified that although some of the accounts had been moved, he had not withdrawn any assets from any of the accounts.
George Morgan, a financial advisor, testified for Stephanie at the hearing and evaluated the worth of the U.S. Software account as of February 3, 1998, as $360,963. The Sitel account had a value of $9,900 on January 1, 1998, but as of March 31, 1998, had a balance of $14,836.76. The Intrust account was valued, in a statement for the period from October 1 to December 31, 1998, at $17,880.58. Stephanie testified that the valuations for the Sitel and Intrust accounts were the closest dates of valuation to February 3, 1998, available in the records for each company.
The Intrust account, as of March 31, 2006, had appreciated in value to $42,400.17. The Sitel account, at the time of trial, had a value of "about $10,000." The value of the U.S. Software account at the time of trial is more uncertain. As previously noted, Morgan valued the account at the time of the decree at $360,963. When the account was moved in September 2000, it was worth $147,176. And Dennis' counsel argued at the contempt hearing that "the account today is worth about $83,000." But there does not appear to be testimony or evidence in the record to substantiate that figure.
*448 The district court found that since February 3, 1998, the value of the three accounts had decreased because of conditions in the stock market. But the court found that Stephanie had failed to prove that had the QDRO's been properly executed, she would have been able to increase the value of the assets from their present value. Thus, the court concluded that Dennis' one-half of the accounts was of equal value to Stephanie's at the time of trial and that Dennis had not increased his value over that to which Stephanie was entitled. The court concluded that Dennis was in contempt for failing to prepare the QDRO's and that Stephanie was entitled to "one-half of the current value" of the accounts.
On July 20, 2006, the court entered an order finding Dennis to be in contempt. On August 9, 2006, two QDRO's were filed in the court, apparently with respect to the Sitel and Intrust accounts, although this is not entirely clear from the record because of the movement of accounts to Robert W. Baird & Co. Each of these QDRO's awarded Stephanie "50% of the Plan," without specifying a date of valuation or division. On August 15, the court entered an order finding that Dennis had complied with the earlier order of the court and purged himself of contempt. On August 17, Stephanie appealed.

ASSIGNMENT OF ERROR
Stephanie assigns, as consolidated, that the district court erred in awarding her one-half the current value of the accounts, instead of one-half the value as of February 3, 1998.

ANALYSIS
As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate,[1] and the date of valuation is reviewed for an abuse of the trial court's discretion.[2] But the issue in this case is not the date upon which the accounts were to be valued for division. Instead, the issue is whether the QDRO's should have incorporated the February 3, 1998, date specified in the decree. A QDRO is, generally speaking, simply an enforcement device of the decree of dissolution.[3] Arid Dennis has not argued in this proceeding that the original decree should be modified based on fraud or gross inequity. Thus, Stephanie argues that the QDRO should reflect the date of valuation she contends was expressed in the decree.[4]
We note that Stephanie's notice of appeal was filed on August 17, 2006 within 30 days of both the August 9 filing of the QDRO's and the August 15 discharge of Dennis' contempt. It is not clear from which order or orders she intended to appeal. In Klinginsmith v. Wichmann,[5] an appeal from the denial of an application for contempt, we observed that dissolution of marriage cases are equitable in nature, and a civil contempt proceeding cannot be the means to afford equitable relief to a party. But we also recognized that under certain circumstances, *449 it may be necessary for an individual to cite the other party for contempt to determine whether the other party is holding property that properly belongs to that individual under the terms of a decree.[6] And we acknowledged that in making that determination, the trial court must attempt to resolve the question based upon the language of the decree and the evidence then presented.[7]
Thus, a contempt proceeding is appropriate to resolve the meaning of disputed language in the decree under these circumstances.[8] Even though that may involve "interpretation" of the decree, the interpretation must be based on the language of the decree.[9] It is well settled that once a decree for dissolution becomes final, its meaning is determined as a matter of law from the four corners of the decree itself.[10] In other words, whether this appeal is regarded as having been taken from the district court's entry of the QDRO's or discharge of Dennis' contempt, the underlying issue is the same, and is determined as a matter of law; Were the QDRO's entered on August 9, 2006, consistent with the terms of the October 5, 1998, decree?
We addressed a similar issue in Hoshor v. Hoshor.[11] There, the parties were divorced pursuant to a consent decree providing that the wife "`should receive one-fourth of any payments received from the [husband's] pension and retirement plan by [the husband] at the time such payments are received.'"[12] Several years later, the district court granted the wife's request to enter a QDRO consistent with the decree, distributing one-fourth of the pension, without offsetting postdecree accumulations to the pension. On appeal, we affirmed the court's entry of the QDRO, reasoning that
because the plain language of the parties' settlement agreement refers to the husband's pension plan, without limiting that term to pension benefits earned during the marriage, we conclude that the trial court was correct in finding that the parties intended that the wife would be entitled to the pension benefits that were earned by the husband both during the parties' marriage and after dissolution.[13]
Although we concluded in Hoshor that the parties were required to share the effect of the postdecree change to the value of the disputed assets, Hoshor stands for the broader proposition that where the terms of a final decree are unambiguous, a QDRO enforcing that decree must dispose of assets in the manner required by the decree.
In particular, the QDRO should reflect the value assigned and awarded in the decree. The purpose of assigning a date of valuation in a decree is to ensure that the marital estate is equitably divided. A specific, predictable date of valuation has the effect of clearly allocating the risk of any change in the value of the asset.[14] An early valuation date, as in this case, sensibly assigns the risk of a decline in the value of the asset to the party in *450 control of the asset.[15] And because the valuation and distribution of a particular asset rarely takes place in a vacuum, a specific, consistent, and enforceable date of valuation permits the trial court to allocate all the assets of the marital estate in an equitable and fair manner.[16] Thus, the equitable distribution of the marital estate depends on enforcing the date of valuation expressed in the decree.
And contrary to Dennis' suggestion, the decree in this case clearly provided that February 3, 1998, was to be the valuation date of the disputed accounts. While some assets in the decree were more specifically divided "based upon [their] value as of February 3, 1998," Dennis does not explain what the language dividing the disputed accounts "equally between the parties as of February 3, 1998" means, if it is not the date upon which the value of the accounts was to be assessed.
The financial statements in the record illustrate that the IRA and 401K plans in which the disputed assets were invested at the time of the divorce were not portfolios of stocks, commodities, or other assets they were simply investment accounts, with stated dollar values. The only reasonable interpretation of the decree is that Stephanie was awarded one-half of the dollar value of each account as of February 3, 1998. As a matter of law, that award controls the date of valuation for purposes of subsequent QDRO's.[17] (The allocation of changes in value in the U.S. Software account, by the 2001 QDRO, does not reflect on the meaning of the original 1998 decree. The evidence indicates that the 2001 QDRO was prepared and submitted to the court by Dennis' counsel, without Stephanie's approval.)
This is not a situation, like Hoshor,[18] in which the decree clearly contemplated that postdecree changes in value were to be shared by the parties. Nor is this a situation in which the decree did not assign a specific date of valuation.[19]
Instead, the situation in this case is apparent: the decree specified a valuation date for the disputed accounts, assigning the risk of a decline in the value of the assets to Dennis, the party in control of them. Had all the assets appreciated in value, Dennis, but not Stephanie, would have benefited from the increases.[20] Instead, some of the assets depreciated. But the date at which the value was to be determined was agreed upon by the parties and set forth in the decree.[21] Any perceived inequality was the result of a falling stock market, not an unequal distribution in the decree.[22]
And more importantly, that Dennis bears the brunt of that decline, in value was solely precipitated by Dennis' inexcusable delay in entering the QDRO's required by the decree.[23] There is no suggestion *451 in this case that any funds were added to, or withdrawn from, the disputed accounts after the decree was entered.[24] Nor was the delay in distribution the result of court proceedings, such as a bifurcated proceeding,[25] or an intervening appeal.[26] The record is clear that Dennis was responsible for filing the QDRO's to segregate the assets awarded by the decree and, obviously, that Dennis (or his attorney) was responsible for the 8-year delay in complying.
Dennis argues that because the Intrust account was an IRA, instead of a 401K, no QDRO was actually necessary to distribute the funds. The accuracy of that contention is not entirely clear, at least as far as the tax consequences are concerned.[27] But regardless, Dennis' contention is not on point. The decree directed Dennis to file a QDRO for the Intrust account, and he did not do so until after this contempt proceeding was brought. If proved, a good faith belief that a QDRO was not needed for division of the asset might be relevant to whether Dennis was willfully in contempt of court. But it would not obviate Stephanie's underlying right to one-half of the value of the account on the date specified by the decree.
Dennis also relies on the district court's reasoning that Stephanie "failed to prove at trial that, had the QDROs been timely executed, that she would have been able to increase the assets from what they currently are." But it was not Stephanie's burden, in this proceeding, to prove that she was damaged by Dennis' failure to comply with the decree. In fact, an award of damages is unavailable in a civil contempt proceeding.[28] Instead, the purpose of this proceeding was to determine whether Dennis was holding property that properly belonged to Stephanie under the terms of the decree.[29] She was not required to prove what she would have done with the property, had it been made available to her earlier, in order to establish her legal right to possess it.
In short, we conclude that the district court erred in entering QDRO's that did not divide the disputed assets as of February 3, 1998, and in determining that by filing those QDRO's, Dennis had complied with the requirements of the decree. The court, in effect, permitted Dennis to modify the terms of the decree without establishing the factual basis for a modification. Stephanie's assignment of error has merit.
We note that the evidence at the contempt hearing was not entirely clear with respect to the value of the accounts as of February 3, 1998, and that because of its disposition of this case, the district court made no findings with respect to valuation. On remand, it will be necessary for the district court to determine the sum to which Stephanie is entitled, representing one-half of the value of the accounts on February 3, 1998. We recognize, from the representations of counsel, that at least *452 one of the accounts may have lost more than half of its February 3, 1998, value. If that proves to be the case, then it will be necessary for the court and parties to consider other ways in which Dennis can comply with the decree.
We also note that it is unclear whether valid QDRO's have, even now, been entered with respect to all of the disputed accounts. The record does not specify which assets were divided by the two August 9, 2006, QDRO's. The February 27, 2001, QDRO for the U.S. Software account was apparently ineffective because the account had already been transferred to another investment. In other words, the record before us evidences three disputed accounts, but only two effective QDRO's, neither of which are consistent with the decree. On remand, it will be necessary for the district court to enter QDRO's effective as to all of the disputed assets.

CONCLUSION
We reverse the judgment of the district court and remand the cause with directions. Specifically, the district court is directed to (1) determine the value of each of the disputed accounts as of February 3, 1998, and (2) supervise the entry of QDRO's transferring one-half of the February 3, 1998, value of each account to Stephanie. If the balance of any of the accounts is insufficient to satisfy the award, then the district court, assisted by the parties, should determine how Dennis will comply with the decree. Any other issues arising during those proceedings should be resolved by the district court in a manner consistent with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
STEPHAN, J., dissenting.
I disagree with the majority's central premise that the decree established February 3, 1998, as a "valuation date" for the retirement plan assets, resulting in an award to Stephanie of "one-half of the dollar value of each account as of February 3, 1998." Had the award of a specific amount been the district court's intent, it could easily have done so in explicit terms,[1] but it did not.
In its division of the retirement plan assets, the court did not use a sum certain nor did it include a reference to "value," as it did with other marital assets. Rather, it provided that the retirement plan accounts were to be "divided . . . equally between the parties as of February 3, 1998." I interpret this language as identifying the assets held in the accounts on that date to constitute marital property subject to division and to award each party one-half of those assets.
For purposes of division of property in the dissolution of marriage, the marital estate includes "any pension plans, retirement plans, annuities, and other deferred compensation benefits owned by either party, whether vested or not vested."[2] The marital estate includes only that portion of a pension plan which is earned during the marriage, and contributions to pensions before marriage or after dissolution are not assets of the marital estate.[3] We have held that parties may agree to the division of pension and retirement plan assets acquired outside the marriage, notwithstanding that a court could not divide *453 such assets without such an agreement.[4] That is not what the parties did in this case; here, they simply agreed that the assets held in the three retirement plan accounts as of February 3, 1998, were a part of the marital estate, to be divided equally between them.
The record reflects that the retirement plan accounts included stock, annuities, mutual funds, and some cash. The district court specifically found that the value in the accounts had decreased "due to conditions in the Stock Market." As the named participant in the plans, Dennis had the power to withdraw assets and thus controlled whether the assets held in each account on February 3, 1998, remained in the account at the time of the decree and subsequent entry of the QDRO's. However, Dennis had no control over the value of the assets held in the accounts.
The majority cites Reese v. Reese[5] for the proposition that an early valuation date "sensibly assigns the risk of a decline in the value of the asset to the party in control of the asset." In Reese, the valuation date concerned a business over which the appellant "had complete control of the company both before and after the petition for dissolution was filed."[6] In this case, unlike Reese, the value of the retirement accounts was determined by the market, not by any action or inaction by Dennis.
Under the majority's reasoning, Dennis would bear the risk of any decline in market value from February 3, 1998, until the entry of the QDRO, even if that entry were accomplished in a timely manner, and Stephanie would be deprived of the benefit of any appreciation in the value of the assets during the same period. There is no language in the decree to support this reasoning. Instead, the decree is entirely silent as to how market gains or losses occurring after February 3, 1998, and prior to entry of the QDRO's are to be treated by the parties in dividing the retirement plans "equally." Other courts have held that even where a decree refers to a specific "valuation date" for retirement plan assets, in the absence of express language stating otherwise, the decree implicitly contemplates that both parties will share all of the rewards and risks associated with an investment account, so that the parties share equally in gains or losses occurring after the valuation date and before division pursuant to a QDRO is accomplished.[7]
From the record, I conclude that this is what the court intended in this case. The 2001 QDRO for the U.S. Software account was entered by the same judge who entered the decree, and thus presumably reflected the court's intent. It states that "rainy gains, losses, income, depreciation or appreciation on [Stephanie's] interest in the Plan from and after February 3, 1998, shall be hers exclusively." It further states that any "gain, losses, income, depreciation or appreciation" on Dennis' interest, as well as "any new deposits to the Plan by or on behalf of [Dennis] from and after February 3, 1998" shall belong exclusively to Dennis. Stephanie's application to show cause filed in 2004 alleged that *454 Dennis' counsel had prepared only one of the three QDRO's required by the decree, but did not take issue with the language of the 2001 QDRO. Although this language does not appear in the two subsequent QDRO's entered by the court in 2006, those later orders simply award Stephanie "50% of the Plan" with no reference to the February 3, 1998, date. Because the record reflects that Dennis did not withdraw any assets from any of the plans after February 3, 1998, I submit that all three QDRO's accomplished precisely what the decree intended: an equal division of the retirement plan assets which existed as of February 3, 1998, with fluctuation in market value shared equally by the parties. Under the majority's disposition, however, Stephanie will receive much more than 50 percent of the accounts, perhaps even 100 percent plus an additional payment. This is hardly the equal division required by the decree.
What Stephanie really seeks in this case is damages resulting from Dennis' delay in preparing the QDRO's. Citing cases from other jurisdictions, she argues: "If a former spouse is culpable for the delay, in distribution, the other spouse can be awarded damages for the other's actions or, as in this case, inactions."[8] This argument fails for two reasons. First, as the district court noted, Stephanie did not prove that earlier execution of the QDRO's would have prevented the decline in market value of her interest in the retirement plans. Second, and more basic, damages are not recoverable in a civil contempt proceeding.[9]
For these reasons, I respectfully dissent.
NOTES
[1] See, Tyma v. Tyma, 263 Neb. 873, 644 N.W.2d 139 (2002); Brunges v. Brunges, 260 Neb. 660, 619 N.W.2d 456 (2000); Walker v. Walker, 9 Neb.App. 694, 618 N.W.2d 465 (2000).
[2] See, Tyma, supra note 1; Walker, supra note 1.
[3] Koziol v. Koziol, 10 Neb.App. 675, 636 N.W.2d 890 (2001).
[4] See, e.g., Hoshor v. Hoshor, 254 Neb. 743, 580 N.W.2d 516 (1998).
[5] Klinginsmith v. Wichmann, 252 Neb. 889, 567 N.W.2d 172 (1997).
[6] Id.
[7] Id.
[8] See id.
[9] Id.
[10] Id.
[11] Hoshor, supra note 4.
[12] Id. at 745, 580 N.W.2d at 518.
[13] Id. at 752, 580 N.W.2d at 522.
[14] Quillen v. Quillen, 671 N.E.2d 98 (Ind. 1996).
[15] See Reese v. Reese, 671 N.E.2d 187 (Ind. App.1996).
[16] See, e.g., In re Marriage of Priddis, 132 Cal.App.3d 349, 183 Cal.Rptr. 37 (1982).
[17] See, e.g., Kremenitzer v. Kremenitzer, 81 Conn.App. 135, 838 A.2d 1026 (2004); Grecian v. Grecian, 140 Idaho 601, 97 P.3d 468 (Idaho App.2004); Perry v. Perry, 143 S.W.3d 632 (Ky.App.2004).
[18] Hoshor, supra note 4.
[19] Compare, e.g., Austin v. Austin, 748 A.2d 996 (Me.2000); Bradley v. Bradley, 194 S.W.3d 902 (Mo.App.2006); Musick v. Musick, 144 Md.App. 494, 798 A.2d 1213 (2002).
[20] See, e.g., Perry, supra note 17.
[21] See Grecian, supra note 17.
[22] See id.
[23] Compare, e.g., In re Marriage of Hayden, 124 Cal.App.3d 72, 177 Cal.Rptr. 183 (1981), with Bradley, supra note 19.
[24] See, e.g., Thompson v. Thompson, 811 N.E.2d 888 (Ind.App.2004); Sample v. Sample, 152 Ariz. 239, 731 P.2d 604 (Ariz.App. 1986).
[25] See, e.g., Leis v. Hustad, 22 P.3d 885 (Alaska 2001); Fastner v. Fastner, 427 N.W.2d 691 (Minn.App.1988); In re Marriage of Walters, 91 Cal.App.3d 535, 154 Cal.Rptr. 180 (1979). See, also, Koziol, supra note 3.
[26] See, e.g., In re Marriage of Hitchcock, 309 N.W.2d 432 (Iowa 1981); Fastner, supra note 25; Sample, supra note 24.
[27] See Bougas v. Commissioner, 86 T.C.M. (CCH) 9 (2003).
[28] See, Smeal Fire Apparatus Co. v. Kreikemeier, 271 Neb. 616, 715 N.W.2d 134 (2006); Klinginsmith, supra note 5.
[29] See Klinginsmith, supra note 5.
[1] See, e.g., In re Marriage of Knutson, 114 Wash.App. 866, 60 P.3d 681 (2003).
[2] Neb.Rev.Stat. § 42-366(8) (Reissue 2004).
[3] Hoshor v. Hoshor, 254 Neb. 743, 580 N.W.2d 516 (1998), citing Shockley v. Shockley, 251 Neb. 896, 560 N.W.2d 777 (1997); Priest v. Priest, 251 Neb. 76, 554 N.W.2d 792 (1996).
[4] Hoshor v. Hoshor, supra note 3.
[5] Reese v. Reese, 671 N.E.2d 187 (Ind.App. 1996).
[6] Id. at 191-92.
[7] Shorter v. Shorter, 851 N.E.2d 378 (Ind.App. 2006); Case v. Case, 794 N.E.2d 514 (Ind.App. 2003); Taylor v. Taylor, 258 Wis.2d 290, 653 N.W.2d 524 (Wis.App.2002); Niccum v. Niccum, 734 N.E.2d 637 (Ind.App.2000); In re Marriage of Gardner, 973 S.W.2d 116 (Mo. App.1998). See, Rivera v. Zysk, 136 Md.App. 607, 766 A.2d 1049 (2001); Austin v. Austin, 748 A.2d 996 (Me.2000).
[8] Brief for appellant at 12.
[9] Smeal Fire Apparatus Co. v. Kreikemeier, 271 Neb. 616, 715 N.W.2d 134 (2006>