IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

MANHART V. MANHART

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOAN E. MANHART, APPELLANT,

V.

PAUL I. MANHART, APPELLEE.

Filed May 5, 2015.    No. A-14-312.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed as modified.

Jill Vinjamuri Gettman, Ryan A. Steen, and Scott E. Daniel, of Gettman & Mills, L.L.P., for appellant.

Hannah C. Wooldridge, of Slowiaczek, Albers & Astley, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and IRWIN and RIEDMANN, Judges.

MOORE, Chief Judge.

Joan Manhart appeals from the district court's decree of dissolution which dissolved her marriage to Paul Manhart. Joan assigns a number of errors, which essentially relate to either the property division or the alimony award to Paul. She also asserts that the district court erred when it awarded Paul a tax exemption. After our review, we find merit to a number of Joan's errors relating to the property division. We affirm the district court's decree as modified.

### I. FACTUAL BACKGROUND

Joan and Paul were married in Las Vegas, Nevada on March 12, 2001. At the time of their marriage, Joan was 35 years old and Paul was 36. Each had an established career at First Data Resources in Omaha when they married: Joan as a lawyer in the legal department and Paul as a

service analyst. Both maintained their employment throughout the marriage and remained at First Data at the time of their separation on June 25, 2012.

On July 16, 2012, Joan filed a complaint for dissolution of marriage. She sought sole legal and physical custody of the parties' two minor daughters, an equitable division of the assets and debts, and an order requiring Paul to pay for all post-separation expenditures he made on a Chase Marriott Rewards credit card. On August 16, 2012, Paul filed an answer and counterclaim in which he sought joint physical and legal custody of the children and an equitable division of the parties' property and debt. Paul also requested the court to award him alimony and attorney fees.

The district court entered a temporary order on August 31, 2012, granting the parties joint legal custody of the children and awarding Joan temporary physical custody. The court required Paul to pay $600 per month in child support. Also included in this order was a provision which granted Joan exclusive occupancy of the marital home in Omaha. Joan was ordered to hold Paul harmless from all expenses associated with the home during the pendency of the matter. The temporary order also included a provision, entitled "Property Settlement Advance", which permitted Paul to withdraw $7,500 from the parties' joint bank account for his use in establishing a new residence. The order reflects Paul having withdrawn this amount from the account at the time the order was entered. Finally, the district court ordered Paul to remove Joan from the Marriott credit card. The court stated that each party was responsible for its own charges incurred against that account after July 3, 2012. Paul's request for temporary alimony was denied.

Prior to trial, the parties attended mediation. During the mediation, the parties came to an agreement on a parenting plan for the minor children. Joan received primary physical custody of the children, subject to Paul's parenting time. Custody is not a further issue in this appeal.

On January 7 and 8, 2014, the district court held a trial. At the outset of the trial, Joan's attorney informed the court that certain stipulations had been reached. Paul's attorney read those stipulations into the record. The parties agreed to the following:

1. Paul would pay child support to Joan in the amount of $615 per month. The parties submitted child support calculations.

2. Each party would retain its own automobile. Joan has a 2008 Volvo and Paul has a 2005 Lexus. They agreed these automobiles were of equal value.

3. Joan would be awarded two Wells Fargo money market accounts. The account ending in 4798 had a balance of $26,436 and the account ending in 5397 had a value of $99,615.

4. Paul would be awarded his E*Trade account which was valued at $8,405 as of July 31, 2012.

5. Each party would be awarded its own First Data 401(k) account as it was valued on July 31, 2012. Joan's account was valued at $279,809 and Paul's account was valued at $283,288.

6. Joan would be awarded 336 restricted shares of Western Union Stock. Based on a closing price of $17.43 on July 31, 2012, this stock was valued at $5,856.

7. Paul would receive all the personal property he requested in Exhibit 37, except for a pool patio set and a set of Swedish glassware. Joan would pay Paul $2,000 and the parties would then consider all personal property to be equalized. The values of the personal property listed in Exhibit 37 were no longer applicable.

8. Joan would be awarded her Northwestern Mutual life insurance policy. The value of the policy was $13,407.

Joan and Paul each testified to their agreement with the stipulations.

The disputed property issues at trial included Joan's claim of a premarital interest of $110,000 of the equity in the marital home and in one-third of the Wells Fargo money market accounts. Paul's request for alimony was resisted by Joan for numerous reasons, including that (1) she was the primary caregiver for their children, (2) she would be assuming 80 percent of the costs involved in caring for the children after the divorce, and (3) changes were occurring at First Data which would affect her employment and bonuses. The division of the tax exemptions for the children was also in dispute. To the extent necessary, we will discuss the specific facts related to these issues in our analysis below.

On March 14, 2014, the district court entered a decree of dissolution. To summarize the decree, Joan received primary physical custody of the children, and the court ordered Paul to pay $615 per month in child support. The court also approved the parties' parenting plan. Both Joan and Paul received the ability to claim one of the tax exemptions related to the two children. The court divided the parties' property equally, which ultimately resulted in Joan owing Paul a $228,312 property settlement payment. The court did not give Joan credit for any premarital interest in the parties' home or the Wells Fargo money market accounts. The court also ordered Joan to pay Paul alimony in the amount of $1,250 per month for 60 months and $5,000 of Paul's attorney fees.

Joan appeals from the decree.

## II. ASSIGNMENTS OF ERROR

Summarized, Joan argues the district court erred when it divided the parties' marital property, granted Paul a tax exemption, and awarded Paul alimony.

## III. STANDARD OF REVIEW

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of discretion. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). A judicial abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

## IV. ANALYSIS

### 1. PROPERTY DIVISION

Joan has assigned a number of errors which relate to the property division in the decree of dissolution. Namely, she contends the district court (1) failed to incorporate the parties' stipulations into the property division, (2) applied an improper valuation date for her checking account, (3) failed to account for a property settlement advance Joan made to Paul, (4) improperly included the Marriott Rewards credit card debt in the marital estate, (5) failed to award her a

premarital interest in the marital home and the Wells Fargo accounts, and (6) improperly valued the marital home. Before separately addressing each of these arguments, we will set out the familiar principles which are applied to divide property in a dissolution action.

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*.

(a) Stipulations at Trial

As set forth in the factual background above, the parties agreed to a number of stipulations at the beginning of trial. Joan argues that the court ignored those stipulations when it valued certain assets and divided the marital estate. In his brief, Paul acknowledges that the property division adopted by the district court does not reflect the stipulations. However, he contends that this court need not alter the property division because the district court's division of the marital estate is still fair and reasonable.

Pursuant to Neb. Rev. Stat. § 42-366 (Reissue 2008), upon marital separation, parties may enter into a written agreement for the disposition of their property, and the terms of such an agreement are binding on the court unless found to be unconscionable. *Shearer v. Shearer*, 270 Neb. 178, 700 N.W.2d 580 (2005). Although the parties' stipulation in the present case was orally entered into the record, we cannot find any authority which would make this oral stipulation any less binding upon the court than a written stipulation. Stipulations voluntarily entered into between the parties to a cause or their attorneys, for the government of their conduct and the control of their rights during the trial or progress of the cause, will be respected and enforced by the courts, where such stipulations are not contrary to good morals or sound public policy. *Cervantes v. Omaha Steel Castings Co.*, 20 Neb. App. 695, 831 N.W.2d 709 (2013); *Theisen v. Theisen*, 14 Neb. App. 441, 708 N.W.2d 847 (2006). Stipulations cannot be contradicted by evidence tending to show the facts to be other than as stipulated. *Cervantes v. Omaha Steel Castings Co.*, *supra*. Finally, the Nebraska Supreme Court has stated that courts will enforce valid stipulations unless some good cause is shown for declining to do so, especially where the stipulations have been acted upon so that the parties could not be placed in status quo. See *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006).

In this case, both Joan and Paul were represented by attorneys who informed the court of their agreement to the stipulations at the outset of the trial. Further, Joan and Paul affirmed their agreement to the stipulations when they testified. Nonetheless, the trial court did not respect and enforce all of the stipulations when it divided the marital property. There is nothing in the decree showing that the court's decision was motivated by a finding that certain stipulations were unconscionable or were contrary to good morals or public policy. In fact, the record is silent as to why the court adopted the values for the parties' property that it did, although it appears that Exhibit C attached to the decree and utilized by the court is Paul's proposed division of property.

That being the case, we find the district court abused its discretion by not honoring all of the parties' stipulations. Accordingly, we modify the property division in the decree to reflect the parties' stipulations.

The chart below compares the parties' stipulations with the values adopted by the court in Exhibit C to the decree of dissolution. We adopt the values from the column demarcated "Stipulation" for our valuation of the parties' property and modify the decree accordingly. From the chart, it is clear the court respected the parties' stipulations as to the value of Joan's Northwestern Mutual Life Insurance Policy and as to the value of the parties' respective First Data 401K accounts. We make no adjustment to the values of those items. However, we adjust the valuation of the parties' vehicles, Joan's Wells Fargo money market accounts, Western Union Stock, the personal property Joan will be receiving, and Paul's E*Trade Account.

We assign no value to the parties' vehicles to reflect the parties' agreement that the valuation of each would be equal. Joan's money market accounts are adjusted to their value as of July 31, 2012, the agreed upon valuation date. Joan's 336 shares of Western Union Stock have been valued as of the closing price on July 31, 2012, as the parties agreed at trial, at a share price of $17.43. This yields a value of $5,856 for the shares. We assign a $4,000 valuation to the personal property that Joan received and assign Paul no value for personal property. This amount reflects the district court's attempt to evenly divide the marital estate as well as the parties' stipulation that Joan would pay Paul $2,000 to equalize the value of the personal property each received. Finally, we amend the valuation of Paul's E*Trade account to reflect its balance as of July 31, 2012, the agreed upon date in the stipulation.

| Description | Stipulation | Decree | Joan | Paul |
|---|---|---|---|---|
| 2008 Volvo | $0 | $16,550 | x | |
| 2005 Lexus | $0 | $11,900 | | x |
| Wells Fargo Money Market #4798 | $26,436 | $21,439 | x | |
| Wells Fargo Money Market #5397 | $99,615 | $124,759 | x | |
| E*Trade Account | $8,405 | $10,031 | | x |
| First Data 401K Joan | $279,809 | $279,809 | x | |
| First Data 401K Paul | $283,288 | $283,288 | | x |
| Western Union Stock (336 shares) | $5,856 | $5,782 | x | |
| Personal Property to Joan | $4,000 | $16,200 | x | |
| Personal Property to Paul | $0 | $2,900 | | x |
| Northwestern Mutual Life Insurance | $13,407 | $13,407 | x | |

(b) Great Western Checking Account

Joan maintains a personal checking account at Great Western Bank. At trial, the court received a statement from this account into evidence. The statement reflects this account had a balance of $16,931 on August 24, 2012. However, Paul testified that he and Joan agreed to value a number of their accounts as of July 31, 2012. Paul stated that it would be appropriate to value this account as of July 27, 2012. The account statement reflects that Joan's checking account had a $10,876 balance on that date. Despite Paul's testimony and the account statement having been received into evidence, the district court valued Joan's checking account at $16,931, a value which corresponds to August 24, 2012. Joan contends this valuation was incorrect. We agree.

As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate, and the date of valuation is reviewed for an abuse of the trial court's discretion. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). The purpose of assigning a date of valuation in a decree is to ensure that the marital estate is equitably divided. *Id*. Because the valuation and distribution of a particular asset rarely takes place in a vacuum, a specific consistent, and enforceable date of valuation permits the trial court to allocate all the assets of the marital estate in an equitable and fair manner. See *Blaine v. Blaine*, 275 Neb. 87, 744 N.W.2d 444 (2008).

We cannot discern any rational purpose for the court adopting August 24, 2012, as the valuation date of Joan's checking account. The record clearly reflects that Joan and Paul separated on June 24 or 25, 2012. This account should have been valued near the date of separation to maintain consistency with the other valuations. The district court's valuation of this account was an abuse of discretion and we modify the decree to reflect this account having a value of $10,876.

### (c) Property Settlement Advance

Joan asserts that the district court failed to take into account the property settlement advance received by Paul in dividing the marital estate. On August 31, 2012, the district court entered a temporary order in which it ordered Paul to receive a property settlement advance of $7,500. Paul removed this amount from a joint bank account prior to trial for the purpose of establishing a new residence.

The district court did not account for this advance when it divided the marital estate. We find this omission was an abuse of discretion. Accordingly, we adjust Joan's equalization payment to Paul by subtracting $7,500 to reflect Paul having received a property settlement advance.

### (d) Visa Marriott Rewards Credit Card

Joan argues that the district court improperly included the Marriott Rewards credit card debt in the division of the marital estate. In the decree, the court included this account as a marital debt and assigned it to Paul in the sum of $20,156. In its temporary order, however, the district court ordered Paul to remove Joan's name from the Marriott Rewards credit card account and stated that each party would be responsible for paying the charges it incurred on the card beginning on July 3, 2012. Testimony at trial revealed that Joan paid off the entire balance on this card as of July 2012 and cut up her card. Paul thereafter incurred $20,156 in debt on this account since the separation. Paul testified that a large portion of this debt was due to his attorney fees. He requested the court consider this debt to be marital because he believed Joan should be responsible for a portion of his attorney fees. In the decree, the district court separately ordered Joan to pay Paul $5,000 in attorney fees.

The resolution of this assigned error is determined by whether the charges incurred separately by Paul after July 3, 2012, are considered to be a marital debt. Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006). The burden to show that a debt is nonmarital is on the party making that assertion. *Id*.

From our review of the record, we find that the district court erred when it assigned the Marriott Rewards credit card account to Paul as a marital debt. Joan adduced evidence to show

- 6 -

that the charges incurred during the marriage on this credit card were fully paid as of July 2012 and that the balance shown at the time of trial resulted from charges Paul made post-separation which were not for the joint benefit of the parties. Paul's request to have the balance considered a marital debt was only to make Joan responsible for a portion of his attorney fees. Because the court ordered Joan to pay Paul $5,000 in attorney fees, it seems clear that the court did not intend to treat the Marriott Rewards credit card account as a marital debt for that reason. We conclude the court erroneously added this account to the property division in the decree, and we modify the decree to exclude this debt from the marital estate.

### (e) Joan's Claims of Premarital Property

Joan next assigns that the trial court erred in its property division by failing to separate out the nonmarital assets that she brought into the marriage. Specifically, Joan contends that at the time of the marriage, she owned a house and possessed a number of stock options from her employment with First Data. Although these assets were later converted into other assets--a different home and Wells Fargo money market accounts--Joan asserts that she produced sufficient evidence to trace the assets throughout the marriage.

It is well established that property which one party brings into the marriage is generally excluded from the marital estate. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006); *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000); *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). The burden of proof to show that property is nonmarital remains with the person making the claim in the dissolution proceeding. *Gress v. Gress*, *supra*. We separately address each of Joan's claims of nonmarital property.

### *(i) Wells Fargo Money Market Accounts*

Joan has received stock options throughout her tenure with First Data. She began receiving stock options in 1996 or 1997, and has continued to receive them every year since. However, Joan testified that a "good portion" of the "very valuable" stock options were premarital. Joan further testified that she has sold various options in order to fund renovations to prior homes.

In the fall of 2007, First Data was purchased in a leverage buyout which resulted in all of Joan's outstanding stock options and restricted shares being purchased. At the time of the buyout, Joan had options that she claimed were premarital. Joan submitted a document into evidence which contained a history of the stock options she received. This document reflects Joan receiving stock options prior to her marriage in 1998, 1999, 2000, and February 2001. However, the document does not reflect the value of the stock at the time she exercised those options or at the time the options were purchased as part of the buyout in 2007. Joan deposited the proceeds from the 2007 buyout into two Wells Fargo money market accounts which were titled solely in her name. At the time of trial, the parties valued these accounts at $26,436 and $99,615. No other funds have been added to these accounts. Although Joan could not state with certainty the value of her stock options prior to the marriage or how much of the Wells Fargo accounts were derived from premarital stock options, Joan estimated that she received one-third of the stock options prior to her marriage to Paul.

The district court rejected Joan's claims that the funds in the Wells Fargo accounts were premarital. The court concluded that Joan was not able to produce evidence to support her

contention that at least one-third of those accounts were premarital. Joan contends this decision was an abuse of discretion.

We find no abuse of discretion in the trial court's decision to treat these accounts as marital property. We agree with the district court's conclusion that Joan did not produce sufficient evidence to trace the value of the stock options which she asserted were premarital.

### (ii) Equity in Marital Home

Prior to her marriage to Paul, Joan was living in the second home which she solely owned. She purchased her first home in 1989 and sold that home in the fall of 1997. Joan testified that she gained $30,000 in equity from the sale of the first home. In September 1996, Joan bought a second home for $83,500. She made a number of renovations to this home which she funded through her bonuses, stock options, and an inheritance of approximately $14,000. Paul moved into this home just before they were married, but Joan continued to make all mortgage payments on this home out of her own checking account and never added Paul to the title. Paul did not own any real estate prior to the marriage. Joan sold the second home for $199,000 and estimated that she had at least $110,000 in equity in the home. She could not produce the mortgage or closing documents from that home to substantiate this claim.

Joan and Paul purchased their first home together in the fall of 2001. This home was located on North 57th Avenue in Omaha. Joan testified that the money she earned from the sale of her previous home went toward the purchase price of this new home. Again, no documents were produced to substantiate this claim. While they owned this home, Joan and Paul made approximately $350,000 in renovations to the home. The renovations included two kitchen remodels, a finished basement, a new roof, and new windows. In 2011, Joan and Paul sold this home for $614,000. Joan testified that they received $416,000 in proceeds from the sale.

Joan and Paul purchased their current home on Ascot Drive in May 2011 for $625,000. For the purchase of this home and the sale of the previous home, Joan used her real estate broker's license to save them approximately $40,000 in commission fees. Joan testified that she believes she has a premarital interest in the current home because she and Paul would not have been able to purchase either of their two homes without the profit she made from selling her first two houses or her stock options and bonuses. She asserted a premarital interest of $110,000 in the family home. However, Joan conceded that she could not trace her marital interest with precision. Paul testified that he did not understand how Joan arrived at the $110,000 figure she claimed as a premarital interest.

The district court concluded that Joan could not prove her premarital interest by a preponderance of the evidence. The court stated that Joan could only offer her "best guess" as to the amount of her premarital interest. Joan contends this conclusion was an abuse of discretion.

The Nebraska Supreme Court has addressed similar circumstances in previous cases. In *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001), the Supreme Court addressed an appeal from a decree of dissolution which involved a husband's claim of a premarital interest to a home he brought into the marriage. The Supreme Court stated that the equity in the home at the time of the parties' marriage was an asset which, if established, should be set aside as the husband's separate property. However, the record was silent as to the amount of equity in the home at the time of the parties' marriage. Therefore, the court affirmed the district court's determination that

the entirety of the equity in the residence should be treated as marital property. In other cases, the Supreme Court has stated that a party which made a downpayment on the marital home with separate funds prior to marriage or with inherited funds may have a claim for a nonmarital interest in the downpayment. See *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003) (both parties testified that husband's inheritance used for downpayment on family property), *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000) (documentation provided to support claim of downpayment by husband from nonmarital funds).

As the party claiming the premarital interest, Joan has the burden to show that she had a separate interest in the home's equity. She testified at trial that she believed she had earned $110,000 in equity from the sale of her second home which she used as a downpayment on the parties' first home, although she was unable to produce any documentation to support that claim. Additionally, Joan did not present evidence to demonstrate that her contribution retained its status as separate property after the parties sold that first home and purchased the second home. Even if we assume that Joan did trace her interest in the home's equity from the sale of her second home to the purchase of the parties' first home, and then to the purchase of the parties' second home, there is insufficient evidence to support Joan's claim that this interest should be valued at $110,000. Based on this record, we cannot say that the trial court abused its discretion in not granting Joan a credit for her contribution to the equity in the marital home.

### (f) Valuation of Marital Home

In addition to the stipulations which were discussed above, Joan and Paul also agreed that Paul's expert, Bruce Wilkie, would provide the sole appraisal of the marital home. Wilkie conducted an appraisal of the marital home on June 18, 2013, and completed a written report which was received into evidence at trial. He concluded that the home should be valued at $555,000 as of June 18, 2013.

At trial, Wilkie testified that he conducted a visual inspection of both the interior and exterior of the home as part of his valuation process. Joan met with Wilkie at the home for the inspection and informed him that the roof was in need of repair. Wilkie testified that he personally observed and photographed an area of deteriorated shingles over the dinette area. He stated that the valuation of the home would be decreased by the cost of repairs if a roof inspection determined that repairs were necessary. Finally, Wilkie testified that he observed the air conditioning unit to be in operating condition during the inspection.

During her testimony, Joan confirmed that she met with Wilkie during his inspection and informed him of the roof issues. Joan further claimed that there were holes in the roof over the dinette area which leaked "quite profusely". Paul also acknowledged that there were problems with this area of the roof. He believed the problems were caused by an ornamental tree which overhangs that area of the house. To address these roofing problems, Joan obtained an estimate for a roof replacement. This estimate was entered into evidence at trial and reflected that a new roof would cost $49,550.

In addition to the roof problems, Joan also testified that she had to replace the home's air conditioner in late June or early July 2013. The cost to replace the air conditioner was $5,500. She claimed that replacing the air conditioner was the best option at the time because of the older age of the previous unit.

The district court adopted Wilkie's valuation of the marital home. Neither party asserts that this valuation was flawed. However, the court did not specifically address Joan's testimony regarding the costs of replacing the roof or the air conditioner. Joan claims that the court abused its discretion because it did not reduce the value of the home by the costs of those repairs.

We conclude the district court did not abuse its discretion when it did not reduce the value of the home by the costs of the repairs to the roof and air conditioner. With regard to the roof, there was no evidence that the entire roof required replacement; rather, only a small area of the roof was identified as needing repairs and Joan did not adduce evidence of the cost of repair of this limited area. With regard to the air conditioner, the appraisal conducted very shortly before the air conditioner was replaced indicated that the air conditioner was in operating condition. Joan has had exclusive use of the marital home since the parties' separation in June 2012. Additionally, the temporary order required Joan to pay all expenses associated with the residence during the pendency of the dissolution action and hold Paul harmless from those expenses. We find no abuse of discretion in the valuation of the home consistent with the agreed upon appraisal.

## (g) Modified Property Division

Having made a number of modifications to the district court's property division, for convenience we include the following chart which captures all of these changes in one location in the opinion. When all modifications are considered, Joan's resulting equalization payment to Paul is amended to $191,508.

| Joan | Description | Paul |
|---|---|---|
| | Real Estate: $555,000 Appraised Value (6/18/2013) | |
| | ($204,045) Flagstar Mortgage | |
| | ($100,000) Great Western Mortgage | |
| $250,955 | $250,955 Equity | $0 |
| $0 | Automobiles | $0 |
| $10,876 | Joan's Great Western Bank Checking #5174 | $0 |
| $0 | First National Bank MMDA #4720 | $0 |
| $0 | FNB Checking #5798 | $1,299 |
| $54 | Great Western Checking #1512 | $0 |
| $26,436 | Wells Fargo Money Market #4798 | $0 |
| $99,615 | Wells Fargo Money Market #5397 | $0 |
| $0 | E*Trade #1332 | $8,405 |
| $279,809 | First Data 401K Retirement Accounts | $283,288 |
| $5,856 | Western Union Stock (336 shares at $17.43 per share) | $0 |
| $4,000 | Personal Property | $0 |
| $13,407 | Northwestern Mutual Whole Life Insurance #2177 | $0 |
| $691,008 | Subtotal | $292,992 |
| ($199,008) | Equalization | $199,008 |
| $492,000 | | $492,000 |
| | | $199,008 |
| | | ($7,500) |
| | Adjustment for Property Settlement Advance | $191,508 |

## 2. TAX EXEMPTION

The district court awarded a tax exemption to both Joan and Paul for one of the children every year. When there is only one minor child, Joan and Paul will alternate claiming the exemption. The court awarded Paul the right to claim the exemption in the first year in which only one child remains a minor. Paul's right to claim this tax exemption is conditioned on him remaining current on his child support obligation.

Joan contends that Paul should not receive a tax exemption. She reasons that because she is the custodial parent and is responsible for 80 percent of the daughters' expenses, she should receive both exemptions. Joan argues she should receive, at the very least, the tax exemption the first year when there is only one minor child.

An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). Although a custodial parent is presumptively entitled to a tax dependency exemption, a trial court may use its equitable powers to allocate an exemption to the noncustodial parent if the situation of the parties so requires. *Id*. Because a tax dependency exemption is an economic benefit nearly identical in nature to an award of child support or alimony, a trial court may exercise its equitable powers to allocate dependency exemptions between the custodial and noncustodial parent. *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). If the situation of the parties does not require allocating a tax dependency exemption to the noncustodial parent, however, a trial court is not required to allocate it. *Id*.

In the case before us, the record demonstrates that at the time of the trial, both parties were working full-time. Joan was earning a net monthly income of $16,206, while Paul's net monthly income was $3,994. Joan has primary physical custody of the children and Paul was ordered to pay $615 per month in child support for two children and $464 when there is only one child. In addition, while the court ordered Joan to maintain health insurance for the children, Paul was ordered to pay 20-percent of each child's unreimbursed medical expenses after Joan pays the first $480. When we consider the amount of child support Paul is paying in relation to his income, we conclude the district court did not abuse its discretion when it awarded Paul the ability to claim a tax exemption on one of the children every year and the sole exemption the first year when only one of the children remains a minor child, so long as he is current on his child support obligation.

## 3. ALIMONY

In the decree, the district court ordered Joan to pay Paul alimony in the amount of $1,250 per month for a period of 60 months. Joan argues that this award was an abuse of discretion, because she is the primary custodian and caregiver of the children as well as the parent who pays most of the children's expenses. She also argues that the circumstances of this case do not satisfy the statutory criteria for an award of alimony. Upon our de novo review of the record, we conclude the alimony award to Paul was not an abuse of discretion.

Neb. Rev. Stat. § 42-365 (Reissue 2008) lists specific criteria which a court should consider when awarding alimony. Specifically, the section states in pertinent part:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by

each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In addition to the criteria listed in § 42-365, in considering alimony upon a dissolution of marriage, a trial court is to consider the income and earning capacity of each party, as well as the general equities of each situation. *Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013). In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. Disparity in income or potential income may partially justify an award of alimony. *Id*. While need is certainly a factor in analyzing alimony, it is only one of several factors within the analysis. *Id*.

At the time of trial, Joan was associate general counsel over the shared transactions group at First Data. This position involved a place on the general counsel senior leadership team and direct reporting to the general counsel. In reaching this position, Joan has received a number of promotions from her first position as assistant counsel. As a result of these promotions, Joan's salary and bonuses have experienced substantial increases. As noted above, Joan was earning a gross monthly income of approximately $26,581 and her annual bonus in 2013 was $117,000. In addition to her career at First Data, Joan has also obtained a real estate broker's license in 2008 and set up a real estate business so she could potentially downsize her legal career.

Throughout his career at First Data, Paul has been in a customer service role as a service analyst. Paul's current title is Senior Service Analyst II. While Paul has received a few promotions in his career, he has not experienced the same increase in income when compared to Joan. Paul's current gross monthly income is approximately $5,741 and his most recent annual bonus was $2,135. Joan testified that she often encouraged Paul to seek advancement at First Data, but Paul repeatedly rebuffed her suggestions.

Joan and Paul's first daughter was born in 2004. They had their second daughter in 2006. After the birth of their first daughter, Joan negotiated the ability to work from home 2 days a week. She maintained this work schedule for 7 years, until the youngest daughter was halfway through all-day kindergarten. Joan testified that this schedule allowed her to maximize her time with her children. While she worked at home, Joan had outside help caring for the children from her mother in the mornings and a nanny in the afternoons. Throughout the marriage, Joan's mother has provided substantial help with the daughters including providing rides to and from school and dance classes and caring for the girls when Joan was away on business trips even though Paul was home at the time.

Joan testified that she had far greater responsibility in the maintenance of the family than Paul during the marriage. According to Joan, she was responsible for all aspects of the girls' care. She stated that she selected the girls' daycare, school, and activities without Paul's involvement. She was also mainly responsible for picking the girls up from daycare, although Paul picked them up infrequently. Paul disagreed with Joan's testimony that he provided few contributions to the household. According to Paul, he was responsible for a lot of shopping and cooked 75 percent of

the meals. Paul also stated that he and Joan shared responsibility for the upkeep of the family home. His contributions were often to the outside of the home which included mowing the lawn, landscaping, patio work, and snow removal. Paul contended that he and Joan shared responsibility for the care of the girls and he acknowledged that they often received help from Joan's mother.

To summarize, Joan and Paul were married for approximately 11 years and each was able to maintain the same career throughout the marriage. Additionally, each contributed to the maintenance of the family, albeit in different ways. When they separated, both Joan and Paul had their own incomes and neither required any type of job training. However, Joan earns substantially more income than Paul does. Paul will also be required to establish a new home for himself and his daughters. After our revision of the property division, both Joan and Paul will receive a net marital estate valued at $492,000.

When we review an alimony award, we do not determine whether we would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Becker v. Becker*, *supra*. After our review of the facts of this case in light of the factors involved in an alimony award, we find the district court did not abuse its discretion in awarding Paul alimony in the amount of $1,250 per month for a period of 60 months.

We also note that Joan argues that changes were occurring at First Data which would dramatically reduce her income and yearly bonus. She claims that these changes will impair her ability to maintain the children's activities and lifestyle without even considering the effect of the alimony award. However, at this point, these arguments are merely speculative. Our decision that the district court did not abuse its discretion in awarding Paul alimony is based upon Joan's earnings prior to the time of trial. See *Titus v. Titus*, 19 Neb. App. 751, 811 N.W.2d 318 (2012) (in the event a motion to modify because of a reduction in income is filed, such a change will not be considered a change that was anticipated by the parties).

Finally, Joan contends that the district court did not allow her to present evidence to rebut Paul's version of his contributions to the family. However, Joan's portrayal of what occurred at trial is not exactly accurate. During her case in chief, Joan provided significant testimony as to her role in the family and her view that Paul was not substantially involved. Joan also thoroughly cross-examined Paul and was able to clarify the extent of Paul's family involvement during the cross-examination. We observe no error in the court's determination that Joan would not be allowed to repeat her earlier testimony as to the extent of the parties' family responsibilities.

## V. CONCLUSION

We modify the property division in the decree of dissolution because the district court did not respect the parties' stipulations, improperly valued Joan's checking account, erroneously included credit card debt into the marital estate, and failed to account for Paul receiving a property settlement advance. We find no merit to Joan's other arguments regarding the property division, tax exemption allowance, or alimony award, and affirm the decree as modified.

AFFIRMED AS MODIFIED.

- 13 -