Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/12/2019 08:06 AM CDT

Mick E. Bayne, appellant, v.
Brittney J. Bayne, appellee.
___ N.W.2d ___

Filed April 12, 2019.    No. S-18-382.

1. **Divorce: Judgments: Appeal and Error.** The meaning of a divorce
   decree presents a question of law, in connection with which an appel-
   late court reaches a conclusion independent of the determination
   reached by the court below.
2. **Divorce: Property Settlement Agreements: Final Orders.** A decree is
   a judgment, and once a decree for dissolution becomes final, its mean-
   ing, including the settlement agreement incorporated therein, is deter-
   mined as a matter of law from the four corners of the decree itself.
3. **Judgments: Final Orders.** It is inherent to a judgment's finality that all
   are bound by the original language used, and all ought to interpret the
   language the same way.
4. **Divorce: Judgments: Intent.** The meaning of a decree must be deter-
   mined from all parts thereof, read in its entirety, and must be construed
   as a whole so as to give effect to every word and part, if possible, and
   bring all of its parts into harmony as far as this can be done by fair and
   reasonable interpretation.
5. **Contempt.** Civil contempt requires willful disobedience as an essen-
   tial element.
6. **Judgments: Intent.** Doubtful or ambiguous judgments are to have a
   reasonable intendment to do justice and avoid wrong.
7. **Divorce: Property Settlement Agreements: Equity: Appeal and
   Error.** When interpreting an ambiguous dissolution decree, an appel-
   late court bears in mind that an action for divorce sounds in equity
   and that the division of property, specifically, is based on equitable
   principles.
8. **Equity.** Equity looks through forms to substance; a court of equity goes
   to the root of a matter and is not deterred by forms.

9. ____. Equity seeks the real and substantial rights of the parties and applies the remedy in such a manner as to relieve those having the controlling equities.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

John A. Kinney, of Kinney Mason, P.C., L.L.O., for appellant.

James M. Buchanan, P.C., L.L.O., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## NATURE OF CASE

This is an appeal from a declaratory judgment action in which the ex-husband sought a declaration that he was entitled to one-half of the proceeds of a home awarded to the ex-wife in the divorce decree and sold approximately 2 years later when she decided to remarry. At issue is the meaning of a provision in the dissolution decree stating that the ex-wife would "have the home refinanced into her own name within 12 months of entry of this decree" and that should she be "unable to refinance the home into her own name within 12 months, [the] house shall be listed for sale and the parties shall equally divide any costs or proc[e]eds from the sale of the home." The provision also provided that it "shall be enforceable by the contempt powers of this court." The ex-wife had refinanced the home approximately 13 months after the entry of the dissolution decree. The ex-wife was approved for refinancing within 1 year of the entry of the dissolution decree, but the bank did not schedule closing on the refinance until approximately 13 months from the entry of the dissolution decree.

## BACKGROUND

Mick E. Bayne and Brittney J. Bayne were divorced on December 9, 2015, pursuant to a consent decree. In August

2017, Mick brought this declaratory judgment action seeking a judgment declaring that he was entitled to one-half of the proceeds from the sale of the marital house that was awarded to Brittney, pursuant to a contingency refinancing provision. The provision stated in relevant part:

> The parties agree that [Brittney] shall receive the property as her sole and separate property, holding [Mick] harmless from any and all claims on the property. The parties shall cooperate in executing any and all documentation to effectuate the transfer of possession of the home. [Brittney] shall have the home refinanced into her own name within 12 months of entry of this decree. This provision shall be enforceable by the contempt powers of this court. Should [Brittney] be unable to refinance the home into her own name within 12 months, [the] house shall be listed for sale and the parties shall equally divide any costs or proc[e]eds from the sale of the home.

Brittney pled the defenses of bad faith and unclean hands.

The evidence at trial demonstrated that the marital house was purchased for $151,500 in 2012. At the time of the divorce, the mortgage on the house was approximately $140,000. Brittney believed the house was worth approximately $150,000 to $160,000 at the time of the divorce. It was undisputed that Mick had caused damage to the house before he vacated it. Brittney described that Mick had "trashed" the house. Brittney cleaned up and paid for repairs or replacement due to the damage to the drywall, flooring, railings, doors, and furniture allegedly all caused by Mick and represented by various photographs entered into evidence.

In the property division of the dissolution decree, approving Brittney and Mick's settlement agreement, Brittney's retirement account was split equally and the marital debt was divided between Brittney and Mick. Mick kept several dirt bikes worth $4,000 in total and a truck with approximately $12,000 in equity. Brittney kept her car that was worth $3,000

and was given the house pursuant to the provision set forth above. Brittney had obtained approval for refinancing within 12 months after entry of the dissolution decree, but did not close on the refinancing until January 13, 2017, approximately 1 month after the 1-year anniversary of the dissolution decree. Brittney testified that she did not set the closing date, which was set by the bank.

Brittney explained that she began the process of refinancing in August 2016. She explained that the delay from August 2016 to January 2017 was due to the need to improve her credit score before the bank would approve her application to refinance. According to Brittney, her credit score had been damaged by Mick's failure to make payments on a credit card account in both their names, which account had been assigned to Mick in the dissolution decree. From August until closing, Brittney was in weekly contact with her mortgage broker. It was not until December that her credit score finally qualified her for refinancing.

At the time of closing for the refinancing, the house was appraised to be worth $170,000, and it was refinanced for what was owed at that time, which was $136,000. Brittney incurred $4,510.64 in closing costs for the refinance.

In addition to repairing damage caused by Mick, after the divorce, Brittney made several other repairs and improvements, which she opined had "increased the value of the house massively." In total, Brittney spent approximately $25,000 on repairs and updates for the house. She replaced all the appliances; made various cosmetic improvements, such as painting and adding new flooring; and added a bedroom and a bathroom to the house. The repairs of the damage caused by Mick, as well as the bedroom and bathroom additions, were completed before Brittney refinanced. Brittney apparently paid all mortgage payments and repairs to the house from the time of the divorce.

Brittney testified that she informed Mick of the refinance sometime around January 18, 2017, and there was evidence that Mick acknowledged the refinance through a social media posting on that date. Despite this, in April 2017, Mick filed a contempt action to enforce the refinance provision of the dissolution decree. According to Brittney, the court dismissed the contempt action on the ground that the house was already refinanced. That order is not in the record, and Brittney did not plead or argue issue preclusion.

Around the same time as the contempt action, Brittney became engaged to be married. Brittney and her fiance determined that the house would not accommodate all of their respective children, and they decided to sell the house. The house sold in June 2017 for $194,000. After deducting $12,385.81 in closing costs and adding $1,817.05 in adjustments for taxes already paid, Brittney received $44,998.39 from the sale.

The district court declared that Brittney had timely refinanced the house and that therefore, Mick was not entitled to one-half of the proceeds from its later sale. The court reasoned that nothing in the decree indicated that time was of the essence and that the provision "[s]hould [Brittney] be unable to refinance the home into her own name within 12 months" does not mean that she had to have the refinance "completed" within a year. Brittney, the court noted, was able to obtain approval for the refinance within 1 year of the decree and was able to close on the refinancing a little over a year after the decree. Mick appeals.

## ASSIGNMENTS OF ERROR

Mick assigns that the district court erred (1) by construing the language of the decree in a manner other than its plain meaning and (2) by failing to declare that the decree could only be interpreted from the four corners of the documents, that there was no ambiguity, and that Mick was entitled to one-half of the proceeds from the sale of the property.

## STANDARD OF REVIEW

[1] The meaning of a divorce decree presents a question of law, in connection with which we reach a conclusion independent of the determination reached by the court below.[1]

## ANALYSIS

Mick asserts that the district court looked outside the four corners of the dissolution decree and, regardless, that it erred in its interpretation of the refinance provision. Mick did not assert below and does not assert on appeal that Brittney failed to obtain refinancing within a reasonable time of the specified 12-month deadline, that her failure to refinance by the 1-year anniversary of the dissolution decree was willful, or that he was damaged by the 1-month delay. Nor does he challenge the district court's finding that Brittney was able to refinance the home into her own name within 1 year of the decree.

At the outset, we note that Brittney, for her part, has not challenged whether declaratory judgment was the proper remedy for Mick to enforce the refinance provision. We will assume, without deciding, that it was proper for the district court to entertain Mick's request for declaratory judgment.[2]

[2,3] A decree is a judgment, and once a decree for dissolution becomes final, its meaning, including the settlement agreement incorporated therein, is determined as a matter of law from the four corners of the decree itself.[3] It is inherent to a judgment's finality that all are bound by the original language used, and all ought to interpret the language the same way.[4]

Even when our determination involves "interpretation" of the judgment or decree,[5] its meaning is determined, as a

---

[1] *Rice v. Webb*, 287 Neb. 712, 844 N.W.2d 290 (2014).

[2] See *Carlson v. Carlson*, 299 Neb. 526, 909 N.W.2d 351 (2018).

[3] *Rice v. Webb, supra* note 1.

[4] See *Kerndt v. Ronan*, 236 Neb. 26, 458 N.W.2d 466 (1990).

[5] See *Blaine v. Blaine*, 275 Neb. 87, 744 N.W.2d 444 (2008).

matter of law, by its contents.[6] Unlike disputes over the meaning of an ambiguous contract, the parties' subjective interpretations and intentions are wholly irrelevant to a court's declaration, as a matter of law, as to the meaning of an ambiguous decree.[7] The Nebraska Court of Appeals' opinion in *Boyle v. Boyle*[8] is disapproved to the extent that it holds differently.

We find no merit to Mick's assertion that the district court looked outside the four corners of the dissolution decree and improperly considered the parties' subjective intentions and interpretations. While there was testimony submitted by both parties, without objection, pertaining to the negotiations leading up to the property settlement agreement, there is no indication the court relied on such testimony in reaching its conclusion. Moreover, even if the district court had improperly relied on the parties' subjective understandings of the decree, it would be of little consequence on appeal, as we reach our conclusion as to the meaning of the decree as a matter of law independently from the reasoning below.[9]

[4] We also find no merit to Mick's assertion that the district court wrongly interpreted the decree. The meaning of a decree must be determined from all parts thereof, read in its entirety, and must be construed as a whole so as to give effect to every word and part, if possible, and bring all of its parts into harmony as far as this can be done by fair and reasonable interpretation.[10] Effect must be given to every part thereof, including such effect and consequences that follow

---

[6] See *Kerndt v. Ronan, supra* note 4.

[7] See *Carlson v. Carlson, supra* note 2.

[8] *Boyle v. Boyle*, 12 Neb. App. 681, 684 N.W.2d 49 (2004).

[9] See *Rice v. Webb, supra* note 1.

[10] See 50 C.J.S. *Judgments* § 742 (2009). See, also, *Whaley v. Matthews*, 136 Neb. 767, 287 N.W. 205 (1939); *Hays v. Christiansen*, 114 Neb. 764, 209 N.W. 609 (1926); 27A C.J.S. *Divorce* § 458 (2016).

the necessary legal implication of its terms, although not expressed.[11]

The real property provision of the decree provided in relevant part that Brittney "shall have the home refinanced into her own name within 12 months of entry of this decree," that "[t]his provision shall be enforceable by the contempt powers of the court," and "[s]hould [Brittney] be unable to refinance the home into her own name within 12 months, [the] house shall be listed for sale and the parties shall equally divide any costs or proc[e]eds from the sale of the home." The district court found that the forced sale provision of the decree did not apply, because Brittney was "able" to refinance and was approved for refinancing within 12 months.

We cannot say that the district court erred by finding that Mick was not entitled to relief under the forced sale provision. As the district court pointed out, the forced sale provision applied only if Brittney was "unable" to refinance the house into her own name within 1 year. The district court found Brittney was "able" to refinance the house into her own name, and Mick does not challenge this determination on appeal.

Instead, Mick responds that the decree makes logical sense only if the forced sale provision was triggered by Brittney's failure to actually complete the refinancing of the home into her own name within 1 year. Mick contends that if the decree is not read in this way, Brittney could have refused to refinance the home into her own name and he would have been left without recourse so long as she was "able" to refinance. This, Mick argues, would render the requirement that Brittney refinance the home into her own name within 12 months meaningless.

---

[11] See, *Klinginsmith v. Wichmann*, 252 Neb. 889, 567 N.W.2d 172 (1997), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), and *disapproved on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012); *Whaley v. Matthews, supra* note 10.

[5] Even if we could ignore the fact that Mick's argument is not supported by the terms of the decree, we are not persuaded by his argument that it is illogical or unfair for the forced sale provision to apply only if Brittney was unable to refinance. The decree set forth three provisions with respect to refinancing the home into Brittney's name: (1) that Brittney was required to do so within 12 months, (2) that this requirement was enforceable by the contempt powers of the court, and (3) that if Brittney was unable to refinance within 12 months, the forced sale provision applied. When these three terms and the fact that civil contempt requires willful disobedience as an essential element[12] are considered together, it becomes clear that the decree is neither illogical nor unfair to Mick.

If after 12 months, Brittney was willfully refusing to refinance the home into her own name despite being able to do so, Mick could bring an action for contempt, and the court could, on pain of contempt, order her to refinance. The contempt remedy would obviously be of no help if Brittney, for whatever reason, did not refinance because she was unable to do so, and that is where the forced sale provision comes into play. If Brittney was unable to refinance within 12 months, the house could be sold and the proceeds split. Together, these provisions would accomplish the obvious goal of removing Mick's responsibility for the debt on the home in a reasonably timely fashion.

Perhaps uncertainty could have been avoided if the decree had been explicit that the court could use its contempt powers to compel Brittney to refinance if she willfully refused to do so. Instead, the forced sale provision was limited to situations where Brittney was unable to refinance. Even so, we see no basis to find that this decree required a forced sale merely because Brittney did not complete refinancing within 12 months.

---

[12] See *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

[6-9] Even if we were to find the decree ambiguous as to what "refinance," "unable," or other terms might mean, it would not be construed differently. "Doubtful or ambiguous judgments are to have a reasonable intendment to do justice and avoid wrong."[13] When interpreting an ambiguous dissolution decree, we bear in mind that an action for divorce sounds in equity[14] and that the division of property, specifically, is based on equitable principles.[15] Equity looks through forms to substance; a court of equity goes to the root of a matter and is not deterred by forms.[16] Equity seeks the real and substantial rights of the parties and applies the remedy in such a manner as to relieve those having the controlling equities.[17]

As explained by the court in *Mihalyak v. Mihalyak*,[18] delays in refinancing of the marital home are frequent and, if reasonable in duration, are generally tolerated. As illustrated by the facts of this case, the process of refinancing can become complicated by factors outside the applicant's control and the applicant cannot unilaterally set the closing date. Thus, the court in *Mihalyak* held that a sale penalty was not triggered despite the fact that the decree stated the wife "'shall'" pay the husband a certain amount representing his share of the equity in the house awarded to the wife, "'on or before'" a set date after the wife's refinancing of the mortgage, and the wife paid the husband his share after that date.[19]

Brittney has the controlling equities in this case. There was no evidence that Brittney willfully failed to complete the refinance of the home within 12 months. Instead, Brittney made

---

[13] 50 C.J.S., *supra* note 10, § 742 at 68.

[14] *Hall v. Hall*, 238 Neb. 686, 472 N.W.2d 217 (1991).

[15] *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002).

[16] *Miller v. School Dist. No. 69*, 208 Neb. 290, 303 N.W.2d 483 (1981).

[17] *National Mortgage Loan Co. v. Hurst*, 120 Neb. 37, 231 N.W. 519 (1930).

[18] *Mihalyak v. Mihalyak*, 11 Conn. App. 610, 529 A.2d 213 (1987).

[19] *Id.* at 612, 529 A.2d at 215.

a good faith effort to complete refinancing within 12 months. She was approved for the refinancing within 12 months and was not in that sense "unable" to refinance her home within 12 months of the decree. Brittney did not control the closing date, and there was no evidence that Mick incurred any harm as a result of the 1-month delay in closing.

It would offend both the plain language of the real property provision of the decree as well as equity and justice to construe it as requiring the sale of the house and equal division of the proceeds under these facts.

## CONCLUSION

For the foregoing reasons, we affirm the judgment below.

Affirmed.