IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE ON BEHALF OF GRACYN H. V. JOSHUA H.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA ON BEHALF OF GRACYN H., APPELLEE,

V.

JOSHUA H., APPELLANT, AND TERESA E., APPELLEE.


Filed June 24, 2025.　　No. A-24-758.


Appeal from the District Court for Dawson County: MATTHEW D. NEHER, Judge. Affirmed.

Brennon D. Malcom, of Malcom, Nelsen & Windrum, L.L.C., for appellant.

Claire K. Bazata, of Berreckman & Bazata, P.C., L.L.O., for appellee Teresa E.


PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Joshua H. appeals from the order of the Dawes County District Court awarding legal and physical custody of Gracyn H. to Teresa E., ordering supervised parenting time, and ordering him to pay $477 in monthly child support. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Joshua and Teresa, who never married, are parents of Gracyn, who was born in October 2021. Gracyn was born with medical issues that have required several surgeries and will require additional surgeries. Joshua and Teresa resided together with Gracyn in Gothenburg, Nebraska, until February 2023 when their relationship ended. Between February and July 2023, even though Joshua remained in Gothenburg, he had "basically zero" parenting time with Gracyn.

- 1 -

In early April 2023, Joshua began dating Jennifer Owens and in July, Joshua moved to Neosho, Missouri, to be with Jennifer. He and Jennifer live with Joshua's two daughters, Owens' 11-year-old son, Owens' 23-year-old daughter, and Owens' newborn grandson. Neosho is an approximately 8- to 9-hour drive from Gothenburg.

## 2. COMPLAINT

In spring 2023, the State filed a complaint to establish child support and medical coverage for Gracyn. Joshua responded with an answer and "cross-complaint" seeking joint legal custody with primary physical custody with Teresa, reasonable parenting time, and an order of support. Teresa also filed an answer along with her own counterclaim in which she requested, among other things, that she be awarded legal and physical custody of Gracyn and that the court determine child support.

## 3. TEMPORARY ORDER

In early August 2023, the court awarded Teresa temporary sole legal and physical custody of Gracyn. Regarding Joshua's parenting time, the court found that Joshua

lives in Neosho, Missouri, which requires approximately eight hours of travel by car to travel to Gothenburg[, Nebraska]. Joshua moved to Missouri in June 2023 to live with a girlfriend. Due to the distance involved, the young age of the child, the paucity of information provided by Joshua concerning his environment, the contributions of his girlfriend to the environment, the amount of time he has available to care for the child in light of his full-time employment, the lack of information concerning who will care for the child while Joshua is at work, and the evidence concerning Joshua's use of alcohol, Joshua's parenting time shall be exercised in Dawson County, Nebraska[,] under the supervision of Teresa . . . Such parenting time shall be no less frequent than once per month on the second weekend of the month from 10:00 a.m. to 6:00 p.m. on the Saturday and Sunday . . .

The court ordered Joshua to pay temporary child support of $317 per month.

## 4. TRIAL

The trial was held over 2 days in April and July 2024. Witnesses at trial included Joshua; Teresa; Jennifer Owens, Joshua's fiancé; Francis H., Joshua's father; Kristin H., Joshua's stepmother; Logan E., Teresa's adult son; Tamara Friedrichsen, Teresa's mother and Gracyn's maternal grandmother; and Wendy Hunt-Most, a mental health therapist who provided therapy to Teresa. During trial, the parties stipulated that physical custody of Gracyn would remain with Teresa.

### (a) Joshua's Testimony

Joshua testified that he is the father of six children: Joshua's oldest son is an adult; he does not have a relationship with another son; he has regular parenting time with his 17-year-old son Caden; he has physical custody of his two daughters (Addison and Bailey); and Gracyn is Joshua's youngest child.

Joshua testified that he is a truck driver working mandatory 70 to 75-hour workweeks and that Teresa was Gracyn's primary caregiver during the time that they lived together. Joshua admitted in 2018 and 2019 that he was using methamphetamine, was convicted of child neglect, and lost custody of his daughters for a little over a year. He agreed that it is not possible to use methamphetamine and safely care for children. He also admitted that during the period of time that he was drinking heavily, there were times that he would black out and not remember things that happened. He admitted to drinking daily until he moved to Missouri to be with Owens. Joshua testified that his reason for moving to Missouri was:

> I'm from that area originally. My mother lives there. My oldest son lives there. I have a son that I don't have a relationship with, but I would like to, so he lives there. My seventeen-year-old is from that area also. He was happy to move back to be with his little brother and his mother. I have a lot of family and friends from that area. Gracyn would be the only missing link out of the family that couldn't just naturally move back to Missouri. While it was a difficult decision to leave him behind, I kind of had to think of the best interest[s] of the whole family. Through kind of speaking with my friends and family, it was recommended that if I thought that was the best move that we could move forward with our relationship with Gracyn. I wasn't getting to see him between February and July when I did finally make the decision to move.

Although Joshua admitted to previously suffering from mental health and substance abuse issues, and admitted that he still uses alcohol occasionally, he stated during the trial that he was a fit parent. He also testified that even though he had been hospitalized for 3 or 4 days due to his drinking and had completed an alcohol and drug evaluation, he was unaware of any recommendations. And although he had weekly appointments with a drug and alcohol counselor for a period of time, he never went to inpatient treatment, and at the time of trial he no longer participated in counseling, he did not attend any meetings to maintain his sobriety, and he did not have a relapse prevention plan.

Joshua admitted that he could not care for Gracyn when he was under the influence and was willing for the court to include in its order that he could not have alcohol 24-hours prior to, or during, visits with Gracyn. He further stated that he was willing to take tests to prove that he was not under the influence during his parenting time and that he did not object to Teresa testing him for alcohol at the beginning of his parenting time with Gracyn, but he requested that Teresa pay for the testing and that the testing be performed by someone who was licensed to administer the test.

Joshua testified that the court's temporary order granting him parenting time from 10 a.m. to 6 p.m. on Saturday and Sunday one weekend per month was difficult due to his work schedule because he gets up at 3 a.m. and does not return home until 6 p.m. For weekends when he has parenting time, he leaves his home on Friday night between 11 p.m. and midnight to drive 8 hours for visits. He also testified that he was not able to exercise visits on Sunday because he had to travel 8 hours back to Missouri. He also explained that between his work schedule and the transportation time:

> I can't hardly keep my eyes open before I even get there to the visit with Gracyn. All I want to do when the visit is over is go to bed and go to sleep, and then I have to get up the

next morning and drive back to Missouri and get a couple [of] hours with my family there. Then I have to go to bed and get up and go to work again. It's . . . very difficult.

Joshua testified that if the court were to award him extended parenting time with Gracyn, he could take some vacation days to spend time with him. He also testified that he could take "[a] couple of days" per month to spend with Gracyn. However, when Joshua was asked why he did not take a Monday off so he could also spend the Sunday of his visitation weekend with Gracyn, he responded that "I guess that thought never occurred to me to do." And when asked, "[s]o you only want to take off the time if [Gracyn] can come to see you, but you're not going to take off extra time to see him in Nebraska," Joshua responded "[c]orrect." He further admitted that since July 2023, he only had two visits with Gracyn and that during that same time frame, he made no effort to take time off of work to spend a full weekend with Gracyn. Joshua also admitted that he does not take advantage of his ability to have video calls with Gracyn because "it involves talking to Teresa" and "I don't want to talk to Teresa."

### (b) Owens' Testimony

Owens testified that Joshua is a good parent and is emotionally nurturing, is physically affectionate, and has reasonable rules and disciplines the children if those rules are broken. She said that they share a four bedroom, three bathroom home and have a bed for Gracyn. She further opined that it was in Gracyn's best interests to have some extended weekends and holiday visits with Joshua. Owens admitted that in June 2024, Teresa offered to allow video calls once per week, but Joshua did not make any calls. Owens further admitted that Teresa had never denied him his court-ordered visit on the second weekend of the month.

### (c) Francis' Testimony

Francis, Joshua's father, testified that he had the opportunity to observe Joshua and Gracyn together and that he

[has] not seen any negative interactions between Josh[ua] and Gracyn or his children in general. I was at the visit with Gracyn and Josh[ua] in November and they . . . interacted together just fine. Gracyn was just a little shy at first, but then after, you know, thirty minutes of them being together, . . . they played together, and I didn't see anything negative between the two for sure.

Francis stated that he and Kristin were the foster parents for Joshua's daughters when they were taken away and they made a commitment to keep the children safe. He stated he would continue that commitment if he were supervising Joshua's visits with Gracyn and that if Joshua was at a visit while under the influence of alcohol, he would end the visit.

### (d) Kristin's Testimony

Kristin, Joshua's stepmother, testified that as a teacher she is a mandatory reporter and that she would report anything that was a danger to Gracyn. Kristin observed Joshua's parenting of Gracyn while he and Teresa were still together and stated that

- 4 -

[t]hey would come over to our home at times for meals on holidays. [Joshua] would give Gracyn a bottle, feed him, he would hold him. I remember an occasion where Gracyn fell asleep in his arms. If Gracyn was going to the stairs or somewhere that might be where he shouldn't be going, a danger, he would bring him back. He would talk to Gracyn and be attentive.

She further testified that since Joshua and Teresa's relationship ended, she was present during one of Joshua's visits with Gracyn and she had no safety concerns regarding Gracyn when he was with Joshua. She further opined that Joshua is a fit parent now that he is free from his addictions and that she felt

that he always had his children's best interest[s] in mind. Even when he had to be separated from his children, he said he would talk to them and just say this is what is best and we worked as a team . . . during that period of time. But I just want to say even when he was not fit, he was still thinking of his children and put them above his own addiction.

### (e) Logan's Testimony

Logan, Teresa's older son, testified that he regularly sees Teresa and Gracyn and described Gracyn as "a little . . . rambunctious, very curious. He is kind of off the wall sometimes. Very loving . . . Really loving kid. He can be a handful time to time, but he's still a really good kid." Logan explained that because of Gracyn's surgeries, he needs special care, but that his mother had trained him how to care for Gracyn. Logan stated that Gracyn and his mother have a "really good relationship."

Logan also testified that before he was of legal age to consume alcohol, Joshua would offer him alcohol. He further testified that he witnessed Joshua drink to the point of intoxication. Logan testified that he believed that his mom was an appropriate caregiver for Gracyn, that it was in Gracyn's best interests to remain with her, and that he had observed Gracyn exhibit anxiety when he was not around Teresa.

### (f) Friedrichsen's Testimony

Friedrichsen testified that as Gracyn's maternal grandmother, she helped care for Gracyn following his surgeries, explaining that "I'm kind of one of his comforts because sometimes he's upset and is hurting and things like that. So sometimes he wants his mom, and sometimes he asks for grandma. And we kind of take turns to whatever makes him happy or whatever makes him comfortable because it is such a long ride for him sitting in a car seat" returning home from his surgeries in Omaha. Friedrichsen testified that at Gracyn's first surgery Joshua showed up late and was "intoxicated because I could smell it on him. And he didn't show up until basically the surgery was over and we were just waiting to go speak to the doctor to see how everything went." Friedrichson stated that she offered to provide supervision for visits between Joshua and Gracyn and that she did provide supervision for a November 2023 visit. According to Friedrichson, when Joshua showed up for the visit, Gracyn "didn't really even know who [Joshua] was" and that "[i]t takes Gracyn a little while to want to interact with [Joshua]." She further testified that during that visit, she did not observe any evidence of a bond between Joshua and Gracyn. Specifically, Gracyn

did not get excited or run to Joshua when he entered the room. However, when Teresa enters a room, Gracyn becomes excited and runs to her and asks her if she wants a hug or a kiss.

(g) Teresa's Testimony

Teresa testified that when she and Joshua were together, she had concerns with Joshua's children Addy and Bailey. She described that "there was a lot of lying and . . . behavioral issues" and Addy had aggression issues including slamming doors, yelling, screaming, hitting, and being mean to Bailey. And although Teresa expressed concerns to Joshua when he would get home from work, he would start drinking and would not address the behaviors. She noted that Joshua drank nearly every night until 1 or 2 a.m., and then he would go to work the following morning hungover. She also testified to an incident when Addy was 12 years old and she put a mechanical pencil near Gracyn's face to poke him but was stopped when Teresa put her hand in the way. On other occasions, when Gracyn would cry, Addy would yell and scream at him. Teresa also expressed concerns with Addy and Bailey being rough with Gracyn. Teresa stated that she and Joshua separated in February 2023 because she "was tired of all of the drinking, and I was tired of the way the kids were acting and Josh not wanting to be a parent."

Teresa testified that the temporary order was put in place in August 2023, which granted Joshua parenting time during the second weekend of every month. According to Teresa, since that order became effective, Joshua had only exercised his parenting time twice--once in November 2023 and once in December 2023. During the December visit, Joshua slept for approximately 2½ hours of the visit. Joshua did not make an effort to exercise his visitation from January through April 2024. And during May, Joshua asked to have visitation during Memorial Day weekend but Teresa testified that she could not accommodate that request because she had plans involving her nephew's graduation and her grandmother's memorial service. In June, Joshua did not come for a visit with Gracyn after he and Teresa disagreed about where the visit would occur. Joshua wanted to have the visit at his parents' home, but Teresa wanted the visit to occur at her home so that Gracyn would be "in his own surroundings" because Joshua had not seen Gracyn in 6 months. She and Joshua then agreed to hold the visit in a public place to allow Gracyn to "figure out who [Joshua] was again" but that she was willing to then allow the visit to move to Joshua's parents' home. Joshua did not attend that visit, nor did he attend visitation in July 2024.

Teresa also stated that Joshua had not requested to see Gracyn while he was in town for court hearings and although she informed Joshua that he could start video calls with Gracyn in June 2024, and depending on how Gracyn was able to handle the calls they could increase to 2 calls per week, Joshua had not made any video calls to Gracyn. Teresa expressed that, until Joshua established a relationship with Grayson, she believed that Joshua's visits needed to be supervised in a place familiar and comfortable for Gracyn. Teresa also testified that she was okay with someone else supervising Joshua's visits with Gracyn but stated that she "would like it to be somebody that Gracyn has a relationship with and is familiar with" such as her parents or her sister. She stated that she tried to get Joshua's parents involved in Gracyn's life, but they did not put as much effort into having a relationship with Gracyn as with their other grandchildren.

Teresa also testified that she has attempted to involve Joshua in medical decisionmaking, but he has not participated. She testified that it was in Gracyn's best interest to have a relationship with Joshua "[a]s long as he can be sober and provide a safe, stable environment, and [Gracyn's]

not being abused or neglected." She further testified that she believed that the current parenting time arrangement as set forth in the temporary plan was appropriate "[f]or right now . . . because [Joshua] needs to try to establish a relationship with [Gracyn]. And like I said, I had offered video calls, and that's how [Gracyn] got to know my family." She also testified that she was agreeable to Joshua having visits outside of her home "[a]fter [Joshua] establishes a relationship with Gracyn." She was also agreeable to another individual supervising Joshua's visits "[a]s long as [Gracyn was] comfortable, and familiar, and going to have a good time." She further admitted that she would be comfortable with Joshua's visits moving from supervised to unsupervised at some point as long as Joshua could prove that his visitations were consistent and went well and that there were no concerns regarding Joshua's alcohol use. Teresa also requested that the court include a provision in its order that allowed her to require Joshua to submit to alcohol or drug testing if Joshua was exhibiting signs of use.

Teresa testified that she was requesting sole legal custody of Gracyn because Joshua lives 9 hours away and communication with him has been difficult, including him not answering her phone calls or text messages, and Joshua not directly or indirectly asking to be involved in decision making regarding Gracyn. Teresa also stated that she believed that it was in Gracyn's best interests for her to continue to make decisions regarding his care. Teresa also expressed that she did not approve of having Joshua's parents supervise Joshua's visits because they did not know Gracyn well enough.

### (h) Hunt-Most's Testimony

Hunt-Most testified that she is Teresa's therapist treating Teresa's childhood trauma, adult verbal abuse, psychological abuse, and her post-traumatic stress disorder (PTSD). Hunt-Most has sessions with Teresa every 2 weeks, and because Gracyn attends those sessions, she has been able to observe Teresa interacting with Gracyn. Hunt-Most noted that she observed a bond between Teresa and Gracyn and that Gracyn "typically plays with toys when he is in session with us and follows her lead and direction. He sits on her lap often. She cares for him with snacks and food sometimes." Hunt-Most further expressed that she has no concerns regarding Teresa's ability to care for Gracyn. During their therapy sessions, Teresa expressed concerns regarding Joshua's alcohol use and concerns regarding Gracyn's physical safety. Teresa also expressed frustrations regarding interactions between Joshua's other children with Gracyn.

### 5. COURT ORDER

The court's decree awarded Teresa sole legal and physical custody of Gracyn subject to Joshua's reasonable visitation, which the court defined as "every other weekend from 10:00 a.m. to 6:00 p.m. Central Time on Saturday and Sunday" and ordered that "[t]hese visits shall be supervised by [Teresa's] sister or [Teresa's] parents and these visits shall take place in Dawson County, Nebraska." The decree also awarded Joshua video communication with Gracyn three times per week. The parenting plan set forth how holidays were to be split between the parties, but did not define the periods of time encompassed by the holidays and did not specifically state that Joshua's holiday parenting time was to be supervised. The parenting plan also included requirements that Joshua not consume alcohol 24 hours prior to, or during, his parenting time and

that he could be required to submit to a breath or urine test prior to commencing visits with Gracyn. Joshua was ordered to pay child support of $477 per month.

## III. ASSIGNMENTS OF ERROR

Joshua's assignments of error, consolidated and restated, are that the district court erred in aspects of the parenting time including (1) requiring his parenting time to be supervised without adequate evidence or findings pursuant to statute; (2) not allowing his father and stepmother to supervise his parenting time; (3) failing to clarify whether his holiday parenting time is required to be supervised; and (4) failing to award him standard noncustodial parenting time and extended summer parenting time.

Although Joshua also assigns as error that the district court erred in accepting evidence and/or argument via email after the matter was submitted, resulting in an increase in his child support obligation, he does not argue this assigned error in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by an appellate court. *Spady v. Pughes*, 33 Neb. App. 373, 17 N.W.3d 188 (2025)

## IV. STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

## V. ANALYSIS

Because all of Joshua's properly preserved assignments of error relate to the district court's determinations regarding his parenting time, we revisit the relevant propositions of law regarding parenting time. In *Sulzle v. Sulzle*, 318 Neb. 194, 216-17, 14 N.W.3d 532, 550 (2024), the Nebraska Supreme Court recently reiterated:

> The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.
>
> The authority to determine custody and visitation cannot be delegated, because it is a judicial function. Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination. The rule that custody and visitation of minor children are to be determined on the basis of their best interests clearly envisions an independent inquiry by the court. Delegation of the court's duty to determine custody and visitation could result in the denial of proper visitation rights of the noncustodial parent.

- 8 -

When a court is required to develop a parenting plan, Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) permits limitations to parenting time or other access for a parent if the preponderance of the evidence demonstrates the parent has, among other things, "committed child abuse or neglect." If a parent is found to have engaged in such activity, "limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." *Id.* Further, the limitations permitted by § 43-2932(1)(b) include, but are not limited to:

(i) An adjustment of the custody of the child, including the allocation of sole legal custody or physical custody to one parent;

(ii) Supervision of the parenting time, visitation, or other access between a parent and the child;

(iii) Exchange of the child between parents through an intermediary or in a protected setting;

(iv) Restraints on the parent from communication with or proximity to the other parent or the child;

(v) A requirement that the parent abstain from possession or consumption of alcohol or nonprescribed drugs while exercising custodial responsibility and in a prescribed period immediately preceding such exercise;

(vi) Denial of overnight physical custodial parenting time;

(vii) Restrictions on the presence of specific persons while the parent is with the child;

(viii) A requirement that the parent post a bond to secure return of the child following a period in which the parent is exercising physical custodial parenting time or to secure other performance required by the court; or

(ix) Any other constraints or conditions deemed necessary to provide for the safety of the child, a child's parent, or any person whose safety immediately affects the child's welfare.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016), also requires:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

### 1. ALLEGED ERROR REQUIRING SUPERVISED PARENTING TIME

Joshua's first assignment of error is that the district court erred in requiring his parenting time to be supervised without adequate evidence or findings pursuant to the statute. He argues that although he admitted to being convicted of child neglect, "[t]here are no findings whatsoever in the trial court's final order regarding [Joshua] committing child abuse or neglect, domestic intimate partner abuse or interfering persistently with the other parent's access to the child." Brief for appellant at 9.

In *Schroeder v. Schroeder*, 26 Neb. App. 227, 237-38, 918 N.W.2d 323, 332 (2018), this court stated:

> In the absence of a request by a party for specific findings, a trial court is not required to make detailed findings of fact and need only make its findings generally for the prevailing party. *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014), *overruled on other grounds, Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017). See Neb. Rev. Stat. § 25-1127 (Reissue 2016). The Nebraska Supreme Court has held that "even where our civil procedure code mandates specific findings, it does so only upon a party's request." *Becher v. Becher*, 299 Neb. 206, 215, 908 N.W.2d 12, 23 (2018). Nebraska case law provides that motions for specific findings of fact pursuant to § 25-1127 must be made "before the final submission of the case to the court." *Stuczynski v. Stuczynski*, 238 Neb. 368, 370, 471 N.W.2d 122, 124 (1991).

Here, because Joshua did not make a request for the district court to make specific findings of fact, the court was not under any obligation to provide specific findings. However, in conducting our de novo review, we note that the record provides ample evidence supporting the court's determination to require Joshua's visits to be supervised.

During the trial, Joshua admitted to having a recent history of both alcohol and methamphetamine abuse. He also admitted to having been convicted of child neglect and to having his children removed from his care by the State due to his drug use. And although Joshua testified that he no longer has substance abuse issues, he admitted that he received little to no treatment for his addictions.

Further, the evidence reflects that Joshua's lack of a bond with Gracyn was primarily, if not completely, of his own making. After Joshua and Teresa's relationship ended, but before Joshua moved to Missouri, he had no contact with Gracyn. Then Joshua chose to move to Missouri, 8 to 9 hours away from Gracyn, and even after being awarded parenting time for the second weekend of every month, he utilized only 2 days of the court-ordered parenting time. We acknowledge that Joshua testified that he could not utilize his parenting time on the Sundays of his

weekend visits because he had to drive 9 hours back to Missouri to be at work on Monday morning. However, Joshua testified that if Gracyn was allowed to visit him in Missouri, he could take "[a] couple of days" per month to spend with Gracyn, but he was not willing to take time off to have visits with Gracyn in Nebraska. Joshua also failed to use weekly video calls to establish a bond with Gracyn because he did not want to talk to Teresa. We also recognize that Gracyn's medical condition requires special care, and that Teresa has been Gracyn's primary caregiver since his birth.

Within this assigned error, Joshua argues that the court erred by requiring supervised parenting time with no provision for the removal of supervision and suggests a decree without such provision cannot be construed as reasonably calculated to protect Gracyn from harm. Contrary to his assertion, upon proper evidence presented to the court, the current parenting plan is subject to modification. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021); see *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016) (right of parenting time is subject to continuous review by court, and party may seek modification of parenting time order on grounds there has been material change in circumstances; best interests of children are primary and paramount considerations in determining and modifying parenting time). For the aforementioned reasons, this assignment of error fails.

### 2. ALLEGED ERROR REGARDING PERSONS AUTHORIZED TO SUPERVISE PARENTING TIME

Joshua next contends that the district court erred in not allowing his father and stepmother to supervise his parenting time. Joshua argues that he testified that he was willing to have his parenting time supervised by his father and stepmother and that they were appropriate persons to supervise his parenting time. However, Teresa expressed concern with the lack of contact between those parties and Gracyn and stated that she did not object to someone other than herself supervising Joshua's parenting time with Gracyn, but she "would like it to be somebody that Gracyn has a relationship with and is familiar with." Teresa also testified that she tried to get Joshua's parents involved in Gracyn's life, but they did not put as much effort into having a relationship with Gracyn as with their other grandchildren. Reviewing the court's order regarding the parties designated to provide supervision during Joshua's parenting time, we cannot say that the district court abused its discretion in not allowing Joshua's father and stepmother to act in that capacity due to their lack of a relationship with Gracyn. This assignment of error fails.

### 3. ALLEGED ERROR IN FAILING TO CLARIFY WHETHER HOLIDAY PARENTING TIME MUST BE SUPERVISED

Joshua's next assignment of error is that the district court erred in failing to clarify whether his holiday parenting time is required to be supervised. We also note that he argues that no location is specified for his holiday parenting time.

The meaning of a decree must be determined from all parts thereof, read in its entirety, and must be construed as a whole so as to give effect to every word and part, if possible, and bring all of its parts into harmony as far as this can be done by fair and reasonable interpretation. *Johnson v. Johnson*, 308 Neb. 623, 956 N.W.2d 261 (2021). Effect must be given to every part thereof, including such effect and consequences that follow the necessary legal implication of its terms, although not expressed. *Bayne v. Bayne*, 302 Neb. 858, 925 N.W.2d 687 (2019).

Here, we acknowledge that although the paragraph setting forth the parties' holiday parenting time schedule in the parenting plan did not repeat the requirements that Joshua's parenting time must be supervised and must take place in Dawson County, when reading the decree and parenting plan as a whole, the court explicitly mentions Joshua's alcohol use as a reason it required Joshua's visitation with Gracyn to be supervised. This concern is warranted regardless of whether the visitation is on weekends or holidays. Accordingly, after reading the entirety of the decree while applying a fair and reasonable interpretation to its meaning, we find that the parenting plan crafted by the court requires all of Joshua's parenting time to be supervised and to take place in Dawson County. This assignment of error fails.

### 4. ALLEGED ERROR REGARDING AMOUNT OF PARENTING TIME AWARDED

Joshua finally contends that the district court erred in failing to award him standard noncustodial parenting time and extended summer parenting time. We disagree. As we previously noted in this opinion, § 43-2932(1)(b) specifically contemplates limitations in noncustodial parenting time when the situation so warrants a limitation. The evidence adduced at trial established that Joshua did not take advantage of his parenting time awarded under the court's temporary order, he did not avail himself of the opportunity to have video visits with Gracyn, and there were concerns regarding both Joshua's drinking and previous drug use and his child neglect conviction. We further note that Joshua has not demonstrated that he can take care of Gracyn's medical needs and that, before increasing his parenting time, Joshua needs to work on building a bond with Gracyn. Accordingly, we find that the district court did not abuse its discretion in the amount of parenting time awarded to Joshua.

### VI. CONCLUSION

For the reasons set forth herein, we affirm the district court's decree in its entirety.

AFFIRMED.